STATE OF CONNECTICUT *v.* STEVEN WILSON
(11647)

PETERS, C. J., HEALEY, DANNEHY, SANTANIELLO and CALLAHAN, Js.

Argued December 5, 1985—decision released April 22, 1986

*John S. Pinney,* special public defender, with whom, on the brief, were *Sara L. Bernstein* and *Thomas E. Gaffey,* for the appellant (defendant).

*Christopher Malany,* deputy assistant state's attorney, with whom, on the brief, were *John Bailey,* state's attorney, *John M. Massameno,* assistant state's attorney, and *Edward Spinella,* former deputy assistant state's attorney, for the appellee (state).

DANNEHY, J. A jury found the defendant guilty of manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (1) and a sentence of ten to twenty years was imposed. The court, *O'Donnell, J.,* denied the defendant's motions for acquittal and for a new trial, and this appeal followed. The defendant claims on appeal that the trial judge erred (1) in denying his motion to suppress incriminatory statements made to police during his station house interrogation and (2) in allowing the state to introduce evidence of prior misconduct toward the infant victim and her sister. We find error on both claims.

I

FACTS

On Saturday, March 15, 1980, at approximately 1 p.m., Patricia Crouse called the Manchester police to report that her baby girl, Amy, was not breathing. An ambulance was immediately dispatched to 34 Williams Street in Manchester where Crouse and her two daughters were living with her parents, Frederick and Pamela Eilerman. Officer Alan Anderson arrived as the ambulance was about to leave. He observed a baby, wrapped in a blanket, being placed in the ambulance, and Crouse climbing into the back of the ambulance. Anderson also saw a man, the defendant, hurriedly pulling on his boots and jacket in an obvious attempt to catch the ambulance. It was developed in testimony that the defendant was a member of the United States Army, stationed in Maryland, who regularly visited with Crouse on weekend leaves. As the ambulance sped off, Anderson offered to transport the defendant to the hospital in his cruiser, and the defendant accepted.

During the ride, the defendant told Anderson that he had been sleeping with the baby and awoke to find that she had stopped breathing and was "turning blue." The defendant repeated this account to admitting per-

sonnel at Manchester Memorial Hospital, and added that he had given Amy mouth-to-mouth resuscitation and thumped her several times on the chest in an effort to revive her. He also said that Amy had been sick for three or four days and had been coughing up phlegm.

Irene Smith, the triage nurse at Manchester Memorial Hospital, immediately placed Amy under intensive care in a special resuscitation room reserved "only for people who we feel are very critical." Smith testified that Amy had multiple bruises about her forehead and body, a swollen upper lip, and bite marks on her upper left arm. She described one bruise on the back of Amy's head as "about the size of a tennis ball," and "pinkish in color." Smith, who had been a nurse for nineteen years, testified that in her opinion the bruise was no more than two hours old.

Eve Klipstein, a pediatrician practicing in Manchester, arrived at the hospital shortly after the ambulance. Klipstein observed that Amy "looked very small, slight. She was pale . . . her skin looked neglected and the diaper area was quite neglected. There was a severe diaper rash." Amy's breathing was shallow, noisy and "labored." Klipstein determined that the infant was unresponsive to pain or even to the sound of her name. As to the bruises, Klipstein testified that some were relatively fresh as indicated by their black and blue discoloration; others, "greenish or brownish" in color, were perhaps several days old. Klipstein's examination revealed hemorrhaging in the retina of both eyes indicating an increase in internal pressure due to general swelling of the brain. She diagnosed Amy as suffering from an injury to the brain which could only have been caused by "trauma to the head." Finally, Klipstein testified that Amy's urine and vomit contained blood, which indicated to her that the infant was very close to death. Amy was transferred

to the Hartford Hospital where she succumbed to her injuries two days later, on March 17, 1980.[1]

Hospital personnel at Manchester Memorial, immediately suspecting child abuse, notified police within an hour of Amy's arrival. Captain Joseph Brooks of the Manchester police department began an investigation that same afternoon. Brooks learned that the defendant had related to a Manchester policeman and the triage nurse in the hospital emergency room how he had found Amy unconscious and had described to them his efforts to resuscitate her. He also viewed photographs of Amy, depicting her bruises and bite marks. At approximately 9 p.m. that Saturday evening, Brooks sent Lieutenant Orville Cleveland and Detective Susan Gibbens to the Eilerman residence to request the defendant and Crouse to come to the police station for an interview. Cleveland, who had come on duty less than an hour earlier, testified that at the time he did not particularly regard the defendant as a suspect and was merely following Brooks' orders. Gibbens, however, was aware "that Patricia Crouse's boyfriend had told hospital personnel that he was responsible."

Cleveland and Gibbens arrived at 34 Williams Street at approximately 9:30 p.m. and were let in by Pamela Eilerman, Crouse's mother. They asked to speak with the defendant and Crouse, and Eilerman directed them to Crouse's upstairs bedroom. One of the other children in the Eilerman household was having a birthday party that evening, and the house was congested with people. Cleveland testified that, once upstairs, after

---

[1] Catherine Galvin, the chief medical examiner, listed the cause of death as "closed head trauma with subdural hematoma and cerebral edema." Galvin explained that "[s]ubdural hematoma refers to the accumulation of blood in the subdural space about the brain. . . . The term 'cerebral edema' refers to swelling of the brain." Richard Simon, a neurosurgeon, testified that the fatal brain injury was caused by "a substantial blow to the head" which, within reasonable medical probability, would not have been caused by a fall from the bed.

informing Crouse and the defendant that the investigation concerned suspected child abuse, he told them that "we would like to talk with them at [p]olice [h]eadquarters, if possible," and that he "would appreciate it if they would come." According to Cleveland the defendant immediately agreed.[2] Crouse expressed an initial reluctance in view of the birthday party in progress, and asked if she could wait until morning. She consented to accompany him, however, when Cleveland reiterated that he "would appreciate it if she could come now." Before leaving the Eilerman residence, Cleveland testified that he advised both the defendant and Crouse that "this was merely a request and that I wanted them to realize that they did not have to accompany us to the [p]olice [d]epartment."[3] Cleveland testified that the two detectives, the defendant, Crouse, and her three year old daughter, Christine, then proceeded to the police cruiser "casually in a group" and made the five minute drive in the cruiser to the Manchester police station.

At the Manchester police station the group entered the room used by the detective division, a large, open room on the first floor containing five or six desks. Other detectives were present who, like Cleveland and Gibbens, were dressed in plain clothes. Cleveland directed Gibbens to advise the defendant and Crouse of their constitutional rights and then left to report to Brooks. The defendant was presented with a copy of

[2] The defendant testified at the suppression hearing that Cleveland stated, "We'd like for you to come down now." The defendant further conceded that he immediately agreed to go to the police station because "I've been in the military so long, I do follow orders and it was just like he was ordering me to come down. So, I followed his directions and told him I would come down." The defendant had been in the military for ten years.

[3] Gibbens testified that had the defendant said he did not want to go, the officers would have left Williams Street without him. Had the defendant changed his mind walking out to the car, the detectives would have allowed him "to return to the house." If he had asked to go home while en route to headquarters, the police would have "taken him home."

the printed form which was used by the police department to advise an individual of his constitutional rights, and, while he was holding it, another identical copy was read to him, word for word, by Gibbens. The defendant was then told to read the rights form and, "if [he] understood each right . . . to initial each paragraph." The defendant read the form, asked no questions, and initialed each paragraph at 9:43 p.m. Gibbens made no attempt to ascertain whether the defendant understood his constitutional rights. She merely informed the defendant that if he had any questions, she would answer them. The group then separated, Crouse and Christine accompanying Gibbens to her private office to be interviewed, the defendant following Cleveland to his office.

The defendant's interview in Cleveland's office commenced at approximately 9:55 p.m. The two were alone, Cleveland sitting behind his desk, the defendant on a chair beside it. Cleveland described the interview as casual, conversational, covering a wide range of subjects, from the defendant's unhappy childhood, during which he had been abused by his adoptive parents, to his military experiences in the demilitarized zone of Vietnam. The defendant admitted having been with Amy at the time she was injured. He recited to Cleveland how he had found Amy unconscious and attempted to revive her. During this interview both Cleveland and the defendant smoked cigarettes and drank coffee. On several occasions Cleveland left his office to report to Brooks, who continued to coordinate the investigation and compile information as it was received from different sources.

After the defendant had finished his narrative of the events surrounding Amy's fall and subsequent injuries, he was asked if he would be willing to give the police a written statement concerning the facts he had just verbally given Cleveland. He said he would. Cleveland

typed a statement, approximating the defendant's words. The defendant read the statement before he signed and acknowledged it before a notary public. Later the defendant asked to extend his written statement. Cleveland added the additional information to the original statement, which the defendant again read and acknowledged. The statement was completed at 12:50 a.m. on March 16, 1980.[4] Cleveland promptly acquainted Brooks with the contents of the defendant's notarized statements. Brooks ordered Cleveland to arrest the defendant on charges of assault and risk of

[4] The defendant's March 16, 1980 statement is as follows:

"Today, March 15, 1980 at approximately 12:30 PM Pat Krause [sic], her daughter Chrissy age three (3), and Amy, age one (1), Pat's younger daughter and I were playing in the bedroom of Pat's house at 34 Williams St., Manchester, Conn. Chrissy and Amy were sitting on the floor. A few minutes later, I picked up Amy and laid her on the bed with me as I wasn't feeling too good. Amy fell asleep and shortly thereafter, I also started dozing off. I woke up a few minutes later because I didn't hear Amy breathing, I noticed she was turning blue so I immediately hit her on the chest to try an[d] restore the breathing.

"Pat walked into the room and I told her to get a cold washrag to put on Amy's chest. As soon as she got the cold rag we started putting water on her chest and the rest of her body because I though she might be going into convulsions. At this point she was breathing but appeared to be having a hard time doing so. I then put my forefinger into her throat in an attempt to dislodge anything that might be there. I then started mouth to mouth resuscitation when I found that her throat was clear. Though she was still breathing at this time, her body seemed limp. It was at this point, approximately 1:15 PM that I called the ambulance. As soon as I called the ambulance, I wrapped the baby in a blanket and took her downstairs and waited for the ambulance.

"I would like to add that earlier this morning, March 15, 1980 that while playing with Amy, I bit her on the left arm. I did this playfully, however it left a mark. I have bit [sic] her in the past when playing but I never left any marks. I am divorced from my first wife who lives in Brinkley, Arkansas.

"I would like to also add, that earlier this morning, approximately 1:30 AM I arrived at Pat Krause's [sic] home at 34 Williams St. in Manchester, Conn. At about 2:00 AM while I was in Pat's bedroom, I picked up the baby, Amy. I held her up over my head and shook her. Prior to doing this, I took the baby from the crib to the bed and was playing with her on the bed. It was at this point that I bit her on the left arm. While I was shaking the baby, I noticed that Pat was getting irritated at me for shaking the baby. At this point I took the baby and put her back into the crib."

injury to a minor child. Crouse was taken home, although she was later arrested for risk of injury in connection with the treatment of her children. The defendant was confined in the police holding cell.

The defendant remained incarcerated at the Manchester police station until Monday morning, March 17, 1980. At approximately 8:47 a.m., police sought to question the defendant one last time before taking him to Superior Court for arraignment. The defendant was taken from his cell to a small room, approximately eight by ten feet in dimension, containing a desk, three chairs and a typewriter. After the defendant was again advised of his *Miranda* rights, Cleveland began to speak with him. Cleveland testified at the suppression hearing that he told the defendant in a soft voice that he understood "how hard it is sometimes when people do certain things, how hard it might be to live with something such as what had happened. I told him that sometimes it's easier for them in the long run to admit to it and that it might be easier for them. It was at this point in time that I noticed [the defendant] had tears in his eyes welling up and began to cry and he related to Detective [Donald] Wright and myself in our presence that he wished to tell the truth." The defendant regained his composure after approximately fifteen minutes. He then gave a second statement in which he admitted having abused both Amy and her sister Christine in the past. With regard to the incident under investigation, Wright testified that the defendant stated that "he struck Amy in the back of the head. That Amy did a backwards flip off the bed onto the floor, at which time he picked her up and placed her back on the bed." A written statement was prepared which the defendant, after again being advised of his rights, signed at 10:15 a.m.[5] He was then taken to Superior Court for arraignment.

---

[5] The defendant's March 17, 1980 statement follows:

"I first met Pat in Aberdeen Maryland during the first part of Decem-

## II

### PROCEDURAL POSTURE AND APPELLATE REVIEW

The defendant in this appeal raises certain fourth and fifth amendment claims concerning the events which transpired at the Manchester police station between March 15 and 17, 1980. The determinative issues concern the defendant's alleged request for a lawyer on Saturday evening, March 15, 1980, when he was initially advised of his rights at the police station

ber of 1979, while in a bar in Aberdeen. When I first met Pat she told me that she was having problems with her husband Charles. Charles had been beating her and her two children. After getting to know one another we became very serious with our relationship, and spoke about getting a divorse [sic] from her husband and my wife, and then getting married ourselves. Since Pat was having problems with Charles I talked her into going back to Connecticut to stay with her mother and her husband. Pat moved to Connecticut in December of 79, near Christmas time. In fact it was Christmas week end that we came to visit her parents with the intention of not going back. This had been planed [sic] prior to us getting there. From that point I started visiting Patty on the week ends. Some time during the first part of January I remember pinching Amy on the check [sic] of her face, on the right side, which left a bruise about a inch and a half long. I remember that when this happened I was just playing with Amy and never realy [sic] wanted to hurt her. Fred, Pats [sic] stepfather, had asked how the bruise got on Amy [sic] face. I told Fred that I had been playing with her and got a little rough with her not meaning any harm. About five weeks ago Pat had told me that her oldest daughter Christine, age 3, had been playing with some makeup and made a mess. When I arrived to visit Pat I disiplined [sic] Christine by slapping Christine in the mouth which made her mouth bleed a little. A couple of weeks after that Pat told me that Christine had been playing with the makeup again and this time had put some on the baby (Amy), age 1. Again I disiplined [sic] Christine by hitting her in the mouth. Christine's mouth started to bleed again. At this time I remember poking Christine in the chest with my finger, which latter [sic] left a bruise mark, and remember spanking Christine on the bottom end with my open hand which later left a couple of bruise marks. On March 15, 1980, I arrived at Pats [sic] house at approximately 1:30 am. I went into where Amy was sleeping and as I started to cover her up, she woke up. I picked Amy up and put her on Pats [sic] bed and started to play with her and bit her on the left arm. Amy started to wimper [sic] a little bit so I picked her up and started to sake [sic] her a little. Amy started to cry and Pat started to get

by Detective Gibbens. On this point the testimony at the suppression hearing was in sharp conflict. Our resolution of the legal issues raised on appeal is rendered especially difficult because the trial court made inconsistent findings with respect to whether the defendant did in fact invoke his right to counsel. Our discussion now turns, as it must, to the procedural posture in which this case has come to us from the trial court.

The defendant filed a motion to suppress the incriminating statements he made to the Manchester police. At the suppression hearing the defendant testified that after Gibbens had advised him of his *Miranda*

upset so I stopped playing with Amy and put her back in the crib. Later on that morning at about 11:30 I was up and went down stairs. Christine had spilled some cereal. I brought Christine upstairs and punished her by pinching her chin which left a little red mark bruise mark [sic], and slapped her on the butt a couple of times. Later on at about 12:30 (noon) I was up on Pats [sic] bed playing with Amy. Amy was sitting up in the bed. I hit Amy in the back of the head twice with my open hand. Amy fell off the bed onto the floor and began crying. I picked Amy up and put her on my shoulder and [sic] stopped crying. I was playing with Amy and I don't understand why I hit her so [h]ard. When I hit Amy she had been sitting on the edge of the bed, and started to fall forward, but went back and did a flip onto the floor, hitting the floor with the back of her head. After picking Amy up and putting her on my shoulder we laid down on the bed and fell asleep. I was just beginning to doze off. Amy had been sleeping for about a half hour. It was at this time that I noticed Amy was not breathing. I hit her on the chest at which time she caught her breath and started breathing. She was not breathing good so I put my forefinger into her throat looking for a blockage. Not finding anything I called Pat who was on her way upstairs and told her to get a cold wet cloth. I thought that Amy was going into convulsions so I wet her down with the cloth and began giving her mouth to mouth. I called an ambulance and wrapped her in a blanket and waited down stairs for the ambulance to arrive.

"Pat was not aware that I had slapped Amy on the back of the head, however, she was aware that in the past I have bruised the children and she told me to ease up on them. On Amy's forehead there is a bruise mark. I do not know how it got there. I remember some time between a month and two months ago Amy had fallen out of her crib. Pat and I were down stairs and we heard her fall. We went up and found Amy on the floor with the mark on her fore head and it looked like some water was coming from the bruise. We put a cloth on the bruise and it started to dry. Pats [sic] mother put some sort of ointment on Amy which seemed to take care of it."

rights, at approximately 9:43 p.m., someone asked him if he wished to have a lawyer present. According to the defendant, he told this person, whom he could not identify, that "I did not have a lawyer in Connecticut or did not know any, so I requested a military lawyer." The defendant had never resided in Connecticut and, at the time of his arrest, was a career soldier, stationed in Maryland, visiting Crouse for the weekend. The defendant further testified that the person with whom he spoke told him that he would try to contact a military lawyer. The defendant recalled that Gibbens, but not Cleveland, was present when he requested a military lawyer. Neither Cleveland nor Gibbens could recall the defendant's alleged request for counsel. The defendant does not claim that he requested a lawyer at any other time during his confinement at the Manchester police station.

The defendant's motion to suppress in the trial court was treated, in effect, as two motions, the first directed to his Saturday night statement, and the second focusing on his statement given the following Monday morning. With respect to the first statement, the defendant claimed in the trial court that he had been taken into custody by Cleveland and Gibbens, either at the Eilerman home or at the Manchester police station, before he gave his statement later that night. He argued that his custodial arrest violated the fourth amendment because it was effected without probable cause which, according to the defendant, did not exist until after he had made his Saturday night statement. *United States* v. *Mendenhall,* 446 U.S. 544, 553–54, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980); *Dunaway* v. *New York,* 442 U.S. 200, 220, 99 S. Ct. 2248, 60 L. Ed. 2d 824 (1979); *State* v. *Ostroski,* 186 Conn. 287, 291–92, 440 A.2d 984, cert. denied, 459 U.S. 878, 103 S. Ct. 173, 74 L. Ed. 2d 142 (1982); *State* v. *Derrico,* 181 Conn. 151, 158, 434 A.2d 356, cert. denied, 449 U.S.

1064, 101 S. Ct. 789, 66 L. Ed. 2d 607 (1980). In the alternative, the defendant argued that he had been subjected to custodial interrogation by Cleveland after having invoked his right to counsel, in violation of the fifth amendment. *Miranda* v. *Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966); *State* v. *Barrett,* 197 Conn. 50, 57, 495 A.2d 1044 (1985); *State* v. *Acquin,* 187 Conn. 647, 672–75, 448 A.2d 163 (1982), cert. denied, 463 U.S. 1229, 103 S. Ct. 3570, 77 L. Ed. 2d 1411 (1983). The defendant claimed with regard to his second statement, given the following Monday morning, that it had been obtained as a direct consequence of his illegal arrest and must therefore be suppressed under *Wong Sun* v. *United States,* 371 U.S. 471, 487–88, 488, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963); *State* v. *Federici,* 179 Conn. 46, 53, 425 A.2d 916 (1979); or, in the alternative, that the statement must be suppressed as having been obtained in violation of the fifth amendment under the rule announced in *Edwards* v. *Arizona,* 451 U.S. 477, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981). The defendant makes the identical claims on appeal.

At the conclusion of the evidentiary hearing concerning the defendant's Saturday night statement, the assistant state's attorney, before presenting evidence relating to the second statement, requested the trial court to decide whether the defendant had been illegally arrested and whether he had requested a military lawyer. The trial court orally stated its decision from the bench. It concluded that the defendant had not been taken into custody before his formal arrest by Cleveland at 12:45 a.m. on March 16, 1980, and further concluded that at that time the Manchester police had probable cause to arrest and, therefore, that no fourth amendment violation had occurred. The court also rejected the defendant's testimony that he had requested a military lawyer, thereby disposing of the

fifth amendment claim. The trial court expressed its intention to file a written memorandum of decision on the issues in the case in several days.

The state then presented evidence with respect to the defendant's second statement given on Monday morning, March 17, 1980. As the grounds for suppression of the second statement had been substantially undercut by the trial court's earlier ruling, the only remaining issue was whether the defendant, although in custody when he gave his second statement, had effectively waived his *Miranda* rights. The trial court, again ruling from the bench with the caveat that a written memorandum would be forthcoming, found that the defendant's failure to ask for counsel, in light of his intelligence and experience, constituted a waiver of his right to remain silent.

Sometime thereafter, the trial court filed an undated and unstamped written memorandum of decision encompassing these issues.[6] In its memorandum the trial court

---

[6]                    "TRIAL MEMORANDUM

"Lieutenant Orwell Cleveland, Detective Susan Gibbons [sic] and another officer all went to the Eilerman residence at 34 Williams Street in Manchester at the direction of Captain Brooks.

"Upon arriving at the home, they talked with Patricia Crouse and Steven Wilson and requested that they accompany them to the Manchester Police Headquarters where they were working on an investigation of the injuries received by Amy Crouse. Patricia Crouse had some reluctance to go immediately, but reconsidered and both Patricia Crouse and Steven Wilson along with Kristine [sic] Crouse went to the Police Department in the police cruiser with Lieutenant Cleveland and Detective Gibbons [sic]. It is the court's conclusion that Patricia Crouse's initial reluctance was motivated by the fact that a birthday party was being held in the home for Steven Wilson.

"Steven Wilson and Patricia Crouse rode in the rear seat of the cruiser and Lieutenant Cleveland and Detective Gibbons [sic] rode in front. At no time was either Steven Wilson or Patricia Crouse restrained, or told that they were compelled to go with the officers.

"Upon arriving at headquarters Officer Gibbons [sic] gave both of them their Miranda rights and she proceeded upstairs with Patricia and Kristine [sic]. At this point the court concludes that (neither are suspects of a crime) both are the logical persons to whom the authorities would look for enlight-

found that the defendant had voluntarily accompanied Cleveland and Gibbens to the Manchester police station on Saturday evening, March 15, 1980, and that he

enment on what had transpired that resulted in the injuries from which Amy suffered. The evidence is abundantly clear that both Steven Wilson and Patricia Crouse voluntarily went to the police headquarters. The fact that they went in a police cruiser does not diminish the voluntariness, but rather is viewed by the court as a convenient mode of transportation, the same as Steven Wilson used to get to the hospital when Amy went in the ambulance. There is no evidence that force or threats were used. The court is satisfied that a reasonable person would have understood that he was free to leave at any time, indeed Patricia did leave and was provided transportation back home when she so desired it, albeit she was subsequently arrested.

"The evidence supported a conclusion that the attitude and demeanor of Steven Wilson was not that of a person who felt threatened or confused. He presented a picture of a person possessed of his faculties and at ease, smoking and drinking coffee with Lieutenant Cleveland. It is the court's conclusion that he intelligently exercised a waiver of his Miranda rights.

"The court rejects the argument that the conduct of Steven Wilson was essentially involuntary military obedience, that he had no transportation and that he was not told he could leave. The argument advanced is an attempt to bring the factual situation into *State* v. *Ostroski,* [184 Conn. 455, 440 A.2d 166 (1981),] a decision released at the time of the trial. The court does not agree that the facts are the same on several grounds.

"Whether the defendant asked for a lawyer at any time is an issue which the court must determine from the testimony. The court lacks the assistance of a tape recording or video recording of the interview. There is no question in the court's mind that the defendant was advised of his right to have a lawyer and that if he was unable to afford a lawyer one would be provided. The only issue is whether his expression of a desire to obtain a military lawyer in any way negated his waiver. I do not believe that it did. He was told that the interrogator was unfamiliar with the availability of military lawyers and from the totality, the court concludes that his special request was motivated by his military connections and was more a matter of professional pride and without urgency. It is significant that in his court appearance he did accept a civilian lawyer, and insofar as the court is aware never had a military lawyer. Based on all of the foregoing, the court concludes that Steven Wilson waived his right to counsel.

"It is the court's conclusion that Steven Wilson knowingly and intelligently waived his 'Miranda rights' and specifically, his right to a lawyer. Accordingly, both statements given by the accused are admissible.

" /s/ _____, J.

"O'Donnell"

was not in custody until his formal arrest at 12:50 a.m. on March 16, 1980. The trial court further concluded that the defendant effectively waived his *Miranda* rights. In this regard, the memorandum stated: "The only issue is whether [the defendant's] *expression of a desire to obtain a military lawyer* in any way negated his waiver. I do not believe that it did. He was told that the interrogator was unfamiliar with the availability of military lawyers and from the totality, the court concludes that *his special request* was motivated by his military connections and was more a matter of professional pride and without urgency. It is significant that in his court appearance he did accept a civilian lawyer, and insofar as the court is aware never had a military lawyer. Based on all of the foregoing, the court concludes that [the defendant] waived his right to counsel." (Emphasis added.)

The portion of the written memorandum of decision quoted above clearly implies a finding by the trial court that the defendant had in fact requested counsel. This finding by the trial court directly contradicts its earlier ruling from the bench that the defendant did not request counsel. This contradiction went unnoticed until the appellate division of the chief state's attorney's office began to prepare its brief for this court. On June 6, 1985, more than three years after the defendant had been sentenced, the state filed a motion for articulation with the trial court, seeking a definitive ruling on whether the defendant had requested military counsel.[7] On June 13, 1985, the trial court responded

---

[7] "MOTION FOR ARTICULATION

"Pursuant to Practice Book § 3060B [sic] and the State's obligation to present the Supreme Court with an adequate appellate record; *see* Practice Book § 3096 (1); the State of Connecticut hereby requests this Court to articulate further and to clarify a finding of fact on the defendant's motion to suppress statements.

"At present, there is an apparent inconsistency between the Court's finding of fact on the record and in its subsequent Memorandum of Decision.

to the state's motion by amending the portion of its original memorandum of decision quoted above. According to the amended memorandum: "The only remaining issue is whether the defendant requested a military lawyer. I have concluded that he was not a credible witness and therefore reject this claim. The [c]ourt listened carefully to the witness' testimony and concluded that it represented what he believed to be a courtroom demonstration of professionalism. It was a display of pride in the courtroom. The court noted that [the defendant] accepted a civilian lawyer the day of his court appearance, conduct inconsistent with his testimony. Based on the foregoing the court rejects the claim of a request for a military lawyer."[8]

The trial court's contradictory findings with respect to whether the defendant requested a lawyer places this case in a difficult appellate posture. The parties offer conflicting solutions in an effort to facilitate review. The state suggests in its brief that "[i]n a real sense, the defendant's [fifth amendment claim] has been eclipsed by the trial court's articulation of its finding regarding the defendant's alleged request for counsel." While the state's observation is no doubt true, we find

At the conclusion of the suppression hearing, the Court stated from the bench that it rejected the defendant's testimony that he had requested a military lawyer. . . . Nevertheless, in the Court's memorandum of decision filed sometime later, the Court appears to give some credence to the defendant's testimony. . . .

"The State, therefore, requests the court to clarify the record by articulating its finding of fact on the following question: Did the Defendant request a military or civilian attorney after being advised of his rights by Detective Susan Gibbens of the Manchester Police Department and prior to being questioned by Lieutenant Orville Cleveland?"

[8] The trial court's amended memorandum of decision is identical to the original except with respect to the second to the last paragraph. The amended memorandum reads in pertinent part:

"Whether the defendant asked for a lawyer at any time is an issue which the court must determine from the testimony. The court lacks the assistance of a tape recording or a video recording of the interview. There is

this approach too simplistic in light of the gravity of the issue. The defendant contends that the trial court abused its discretion in responding as it did to the state's motion for articulation, and that, therefore, we should disregard the amended memorandum of decision. On the facts of this case we agree with the defendant.

This court has never before considered the substantive parameters of a motion for articulation under Practice Book § 3082 or a remand for articulation under Practice Book § 3060D. In either case an articulation presupposes ambiguity or incompleteness in the legal reasoning of the trial court in reaching its decision. An articulation may be necessary where the trial court fails completely to state any basis for its decision; *Kaplan* v. *Kaplan,* 185 Conn. 42, 46, 440 A.2d 252 (1981); *Scherr* v. *Scherr,* 183 Conn. 366, 368–69, 439 A.2d 375 (1981); or where the basis, although stated, is unclear. In *State* v. *Lafferty,* 191 Conn. 73, 463 A.2d 238 (1983), we could not discern from the memorandum whether the trial court's decision was based on a finding of fact or on its particular construction of the statute in question. We therefore remanded, specifically ordering the trial court to enter a finding of fact so that we might

no question in the court's mind that the defendant was advised of his right to have a lawyer and that if he was unable to afford a lawyer one would be provided. The only remaining issue is whether the defendant requested a military lawyer. I have concluded that he was not a credible witness and therefore reject this claim.

"The Court listened carefully to the witness' testimony and concluded that it represented what he believed to be a courtroom demonstration of professionalism. It was a display of pride in the courtroom. The court noted that Wilson accepted a civilian lawyer the day of his court appearance, conduct inconsistent with his testimony. Based on the foregoing the court rejects the claim of a request for a military lawyer.

"It is the court's conclusion that Steven Wilson knowingly and intelligently waived his 'Miranda rights' and specifically, his right to a lawyer. Accordingly, both statements given by the accused are admissible.

" s/ O'Donnell, J."

review its conclusions of law. Id., 76–77. In *State* v. *Ostroski,* 184 Conn. 455, 440 A.2d 166 (1981), a case not unlike the instant matter, the trial court found that the defendant had been subjected to "apparent custodial interrogation"; id., 458; and we remanded for an articulation of the precise meaning of an ambiguous phrase. A motion for articulation is not limited to requests that a trial court clarify its decision as between findings of fact and interpretations of law. We have recommended the motion to a party seeking elucidation from the trial court as to its considered evaluation of applicable statutory criteria; *Barnes* v. *Barnes,* 190 Conn. 491, 493–94, 460 A.2d 1302 (1983); and where a challenge is addressed to the "factual basis of the court's decision as reciting facts unsupported by the evidence." *Pandolphe's Auto Parts, Inc.* v. *Manchester,* 181 Conn. 217, 222 n.5, 435 A.2d 24 (1980). We encourage the continued use of postjudgment motions under Practice Book § 3082 where the factual or legal basis of the trial court's decision is unclear. See *Carpenter* v. *Carpenter,* 188 Conn. 736, 739 n.2, 453 A.2d 1151 (1982).

The circumstances are indeed diverse where an articulation may be necessary or useful for meaningful appellate review. Broad diversity, however, does not imply an abrogation of standards. An articulation is appropriate where the trial court's decision contains some ambiguity or deficiency reasonably susceptible of clarification. In the present case, the trial court's first written memorandum of decision is not ambiguous. Quite the contrary, it is definite in stating that the defendant requested a military lawyer, but that the request, because insufficiently "urgent," was legally inadequate to negate the prior waiver. The written memorandum becomes ambiguous only when considered in conjunction with the trial court's earlier finding from the bench that the defendant did not request

counsel. The real "ambiguity" in this case arises from the trial court's failure adequately to explain how it could make two diametrically inconsistent findings on so crucial an issue. This, the state's motion for articulation does not address.

The trial court's original written memorandum of decision flatly contradicts its previous oral findings from the bench. Our rules do not require that a trial court's decision take any particular form; Practice Book §§ 3089, 3060B, 813, 327; and we perceive no inherent difference in legal effect between an oral and a written memorandum of decision. The state in its motion for articulation, instead of asking the court for clarification of its decision, asked the court, in effect, to select one decision over the other. Viewed as a motion for rectification under Practice Book § 3082, the state's request, if timely raised, would not have been improper. Practice Book § 3082 explicitly preserves our common law rule that a trial court possesses the inherent power to modify its own judgments during the term at which they were rendered. *Steve Viglione Sheet Metal Co.* v. *Sakonchick,* 190 Conn. 707, 710, 462 A.2d 1037 (1983); *Tyler* v. *Aspinwall,* 73 Conn. 493, 497, 47 A. 755 (1901). "During the continuance of a term of court the judge holding it has, in a sense, absolute control over judgments rendered; that is, he can declare and subsequently modify or annul them." *Sturdevant* v. *Stanton,* 47 Conn. 579, 580 (1880). Under the common law rule, a distinction is drawn between "matters of substance" and "clerical errors"; the distinction being that mere clerical errors may be corrected at any time even after the end of the term. *Morici* v. *Jarvie,* 137 Conn. 97, 104, 75 A.2d 47 (1950); *Brown* v. *Clark,* 81 Conn. 562, 566–67, 71 A. 727 (1909); *Wilkie* v. *Hall,* 15 Conn. 32, 37 (1842). But "[i]n the absence of waiver or consent of the parties, a court is without jurisdiction to modify or correct a judgment in other than clerical respects

after the expiration of the term of the court in which it was rendered." *Snow* v. *Calise,* 174 Conn. 567, 571, 392 A.2d 440 (1978).

We had previously interpreted the word "term" as used in the common law rule that a judgment may not be modified in substance after the term at which it was rendered to mean "sessions" of court as that period was defined in earlier enactments of General Statutes § 51-181. *Snow* v. *Calise,* supra, 571-72; *Cichy* v. *Kostyk,* 143 Conn. 688, 695-96, 125 A.2d 483 (1956). The present version of General Statutes § 51-181, however, makes no reference to "sessions" of court, and provides simply that "[t]he superior court shall sit continuously throughout the year, at such times and places and for such periods as are set by the chief court administrator." Neither our General Statutes nor our Practice Book rules define the period during which a trial court may modify or correct its judgment in a *criminal* case. On the *civil* side, however, Practice Book § 326 provides that any civil judgment or decree may be opened or set aside "within four months succeeding the date on which it was rendered or passed." We see no reason to distinguish between civil and criminal judgments in this respect, and we therefore hold that, for purposes of the common law rule, a criminal judgment may not be modified in matters of substance beyond a period of four months after the judgment has become final.

The judgment in this case became final when the defendant was sentenced on May 24, 1982. *State* v. *Curcio,* 191 Conn. 27, 31, 463 A.2d 566 (1983). The trial court, when it filed its amended memorandum of decision on June 13, 1985, was clearly without jurisdiction to alter its previous finding, in the original written memorandum of decision, that the defendant had requested counsel. On June 24, 1985, the defendant filed with this court a motion for review of the trial

court's amendment of its original written memorandum of decision. Practice Book § 3108. In that motion the defendant requested that the trial court's amended memorandum of decision be "stricken from the record." On July 17, 1985, we denied the motion without prejudice, subject to its renewal on appeal. We now grant the relief requested. The trial court was without jurisdiction to amend in matters of substance its original memorandum of decision more than four months after sentence had been imposed. We therefore order stricken from the record the trial court's July 13, 1985 amended memorandum of decision.

Although we disregard the amended memorandum of decision, we are nonetheless left with contradictory findings of fact as to whether the defendant requested counsel. The peculiar difficulty in resolving this factual contradiction at the appellate level lies in the circumstance that the trial court's inconsistent findings are contained in mutually independent and legally sufficient memoranda of decision. Practice Book § 813, relating to rulings on motions in criminal trials, requires only that the trial court "state [its] essential findings on the record." There is no requirement that a ruling on a motion in a criminal case be reduced to a written memorandum of decision, although the trial court in the present case apparently believed otherwise. While this court will not choose among conflicting facts to justify a particular outcome, it is our natural inclination to attempt to prioritize the trial court's inconsistent memoranda of decision if at all possible to do so. We are keenly aware that any such endeavor brings us precipitously close to the limits of our constitutional powers. This court has no constitutional jurisdiction to decide disputed issues of fact. Conn. Const., amend. XX § 1; General Statutes § 51-199 (a); *Szarwak* v. *Warden,* 167 Conn. 10, 33, 355 A.2d 49 (1974); *Styles* v. *Tyler,* 64 Conn. 432, 450, 30 A. 165 (1894); see *Kaplan* v. *Kaplan,*

186 Conn. 387, 392, 441 A.2d 629 (1982); *Walkinshaw* v. *O'Brien,* 130 Conn. 122, 127, 32 A.2d 547 (1943); *Belledeau* v. *Connecticut Co.,* 110 Conn. 625, 633, 149 A. 127 (1930). Although our endeavor to give precedence to one or the other of the trial court's factual findings may be distinguished from an improper exercise of jurisdiction by this court, we recognize that the line may become blurred. Therefore, we believe it preferable not to choose between the trial court's conflicting memoranda unless the circumstances objectively indicate a clear and convincing basis for our selection.

We attach some significance to the fact that the trial court's finding that the defendant requested counsel was contained in a written memorandum of decision. The reduction of one's thoughts to writing generally indicates a greater opportunity for considered analysis and careful reflection. On the other hand, our review of the circumstances surrounding the trial court's delivery of its oral findings affirmatively indicates that it had considered in some detail the question of whether the defendant had requested counsel. The defendant had testified at the motion to suppress on February 25, 1982. Thereafter, trial recessed until the morning of March 1, 1982, when the trial court heard oral argument with regard to the admissibility of the defendant's first statement, given to police on the Saturday evening of March 15, 1980. After the attorneys had finished oral argument, the trial court took an extended midday break and reconvened at 2 p.m., at which time the trial court made the following remarks: "During the period when we had been in recess since 11:30 this morning, I've had an opportunity to review my notes. Also, I've called upon the court reporter to read back certain portions of testimony which I did not think in my own notes, were adequate. Particularly having in mind the portion of Mr. Wilson's testimony when he

was on the stand. I've also checked back through my own notes and from my previous research, legal matters in connection with the matter before the court, and I have reread certain cases which I consider are leading cases in the field. I have come to a conclusion and I am prepared at this time, to rule on the motion."

The trial court also stated its intention to file a written memorandum of decision "because of the importance of the motion." The trial court continued: "The memorandum of decision is, I think, essential and it is very vital that it be accurately and carefully drawn in view of the fact that the [Supreme Court] has to rely heavily on what is contained in that memorandum of decision. . . . I would like to have the ability to be able to put together a quick memorandum and read it from the bench into the record. I think that would be fair to both sides. So, to that extent, I am now ready to rule on the motion with the understanding that within the next several days, the memorandum of decision, supportive of the motion, will be filed." The trial court then denied summarily the motion to suppress the March 15, 1980 statement, again with the caveat that "my memorandum of decision will address in detail the question of whether or not Mr. Wilson had been seized at the time of his arrest, and further, as to the *voluntariness* of his confession." (Emphasis added.)

Following the trial court's oral ruling on the admissibility of the defendant's March 15, 1980 statement, the assistant state's attorney was prepared to proceed with evidence relating to the circumstances surrounding the defendant's second and more incriminating statement given to Manchester police prior to his arraignment on the morning of March 17, 1980. The assistant state's attorney recognized, however, that in light of *Edwards* v. *Arizona,* 451 U.S. 477, 101 S. Ct. 1880, 68 L. Ed. 2d 378, reh. denied, 452 U.S. 973, 101 S. Ct. 3128, 69 L. Ed. 2d 984 (1981), a specific find-

ing was necessary on the issue of whether the defendant had requested counsel on March 15, 1980. After reciting the facts and essential holding of *Edwards,* the assistant state's attorney addressed the following specific inquiry to the trial court:

"Mr. Spinella: What I am getting at, I would prefer if Your Honor would tell us how you are ruling as far as whether or not you have found that this defendant, indeed, requested a military attorney, because if he did, then the case of [Edwards v.] Arizona comes into play.

"The Court: I cannot—It would be inconsistent for me to have found that he did request the attorney from some unknown person. I've rejected that claim as of that time.

"Mr. Spinella: Fine.

"The Court: Now, what transpired after that, I don't know.

"Mr. Spinella: I don't either."

Thereafter, the assistant state's attorney, in presenting the state's evidence with respect to the admissibility of the defendant's more incriminating March 17, 1980 statement, relied on the trial court's unequivocal ruling that the defendant had not requested counsel. In specifically requesting a ruling on that issue, the assistant state's attorney was aware that the March 17, 1980 statement would not be admissible merely because it may have been given voluntarily, as suggested by the trial court in its preliminary description of the forthcoming written memorandum. Had the trial court found that the defendant had, in fact, requested counsel, then the assistant state's attorney presumably would have altered his strategy with respect to gaining admission of the March 17, 1980 statement. The trial court's finding that the defendant had not requested counsel rendered any such alteration in strategy unnecessary.

The trial court's oral finding that the defendant had not requested counsel was made less than four days after the defendant had testified, less than three hours after the conclusion of oral argument on the motion, and immediately after the trial court had reviewed its notes and the transcript of the defendant's testimony. Conversely, the written memorandum is undated and unstamped, and hence it is impossible to tell when it was prepared. The trial court's oral remarks to the effect that it would file a written memorandum of decision for the benefit of this court in no way detracts from the credence or validity of its contemporaneous findings. It is highly unlikely, under the circumstances, that the trial court intended that its oral findings be considered merely tentative, subject to change upon the composition of a written memorandum of decision.

On the basis of this record we can no more disregard the trial court's oral finding than we can its later holding, implicit in the written memorandum of decision, that the defendant requested a military lawyer. Although we lack a principled and defensible basis on which to select between the trial court's conflicting findings on an essential fact, we must nonetheless decide the proper disposition of this appeal. In this regard we emphasize that were we convinced that the defendant's statements were properly admissible on either finding, then his conviction would be sustained despite the factual inconsistency. If we accept the trial court's oral finding that the defendant did not request counsel, we would find no fifth amendment violation. On the other hand, the characterization of the issue in the written memorandum of decision as whether the defendant's "expression of a desire to obtain a military lawyer in any way negated his waiver" plainly reflects an improper analysis.

Assuming as true, for the moment, the facts as found in the written memorandum of decision, the trial court

should have determined whether the defendant waived his previously invoked right to counsel. A waiver of counsel "must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case 'upon the particular facts and circumstances surrounding that case, including the background, experience and conduct of the accused.' *Johnson* v. *Zerbst,* 304 U.S. 458, 464, 58 S. Ct. 1019, 82 L. Ed. 2d 1461 (1938)." *Edwards* v. *Arizona,* supra, 482. The state bears the burden of establishing waiver; *North Carolina* v. *Butler,* 441 U.S. 369, 372–73, 99 S. Ct. 1755, 60 L. Ed. 2d 286 (1979); *State* v. *Pecoraro,* 198 Conn. 203, 207–208, 502 A.2d 396 (1985); *State* v. *Wilson,* 183 Conn. 280, 284–86, 439 A.2d 330 (1981); and we do not believe that the presumption against waiver can be overcome by the showing that a request for counsel was made "without urgency," or that it was motivated by "military connections" or by any other reason not directly related to a fear of prosecution. The fact that a request was made at all, instead of being viewed in terms of its sufficiency to negate a prior waiver, must be deemed an objective indication that waiver was not intended. As a matter of principle, if the defendant's manner and motivations made his request ambiguous, the police should at least have clarified his request before beginning their interrogation. *State* v. *Barrett,* supra, 56; *State* v. *Acquin,* supra, 672–75. If the trial court's reasoning contains an implicit finding that the request for counsel was so uncertain as to fall beneath a threshold of ambiguity, then we must disagree. We acknowledge that circumstances may exist where a fleeting reference to an attorney, considered in context, does not amount to an invocation. In this case, however, the defendant's request cannot be so parsimoniously construed. According to the written memorandum, the defendant

"[expressed] a desire to obtain a military lawyer." This expression occurred, if at all, immediately after he was first advised of his right to have a lawyer present. We cannot conclude under such circumstances that the request for counsel was ambiguous. Cf. *Smith* v. *Illinois,* 469 U.S. 91, 92, 105 S. Ct. 490, 83 L. Ed. 2d 488 (1984).

The trial court in its written memorandum of decision concluded that the defendant was not in custody when he requested a military lawyer. It is unnecessary to decide whether this conclusion was "clearly erroneous." Practice Book § 3060D; compare *California* v. *Beheler,* 463 U.S. 1121, 103 S. Ct. 3517, 77 L. Ed. 2d 1275 (1983), and *Oregon* v. *Mathiason,* 429 U.S. 492, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977), with *Dunaway* v. *New York,* 442 U.S. 200, 99 S. Ct. 2248, 60 L. Ed. 2d 824 (1979), and *State* v. *Ostroski,* 186 Conn. 287, 440 A.2d 984, cert. denied, 459 U.S. 878, 103 S. Ct. 173, 74 L. Ed. 2d 142 (1982). While an individual who is not in custody during police questioning is not entitled to *Miranda* warnings; *Beckwith* v. *United States,* 425 U.S. 341, 96 S. Ct. 1612, 48 L. Ed. 2d 1 (1976); he still retains the underlying privilege not to incriminate himself and the right to assistance of counsel in support of that privilege. To be sure, waiver of the privilege against self-incrimination is more readily inferred where an individual who is not in custody freely responds to police questioning. In such a case, the compulsion inherent in coercive surroundings does not exist and the defendant, if he chooses not to answer questions, is free to walk away. While we assume, according to the written memorandum of decision, that the defendant was not in custody until his formal arrest, we consider this an extremely close question. Under the circumstances of this case, the defendant's request for a lawyer, made immediately after he had been advised of his right to have one present, must be

deemed to offset the inference of waiver naturally aris-
ing from his willingness to communicate with police
even though the trial court found that he was not in
custody.

The trial court in its written memorandum of deci-
sion considered the defendant's request for counsel only
in terms of its sufficiency to negate a *prior* waiver, and
therefore did not consider whether that request was
itself an invocation of the right to counsel which could
only be waived by events occurring *subsequently.* If the
defendant did invoke his right to counsel, as appears
from the written memorandum of decision, the trial
court should have determined whether that right had
been waived. If an initial finding of waiver was to be
based on the fact that the defendant, before his for-
mal arrest, was not in custody and was therefore free
to leave the Manchester police station, the trial court
should have gone on to determine whether that waiver
remained "knowing and intentional" on the morning
of March 17, 1980, after the defendant had been
arrested and incarcerated in a police holding cell for
approximately thirty-two hours. In the absence of any
finding on these issues in the written memorandum of
decision, we cannot presume that the state met its bur-
den of demonstrating waiver, particularly with respect
to the March 17, 1980 statement. We therefore hold
that the trial court erred in concluding, on the basis
of the facts contained in its written memorandum of
decision, that the defendant had waived his previously
invoked right to counsel.

Because the defendant's statements were not prop-
erly admissible under each of the trial court's conflict-
ing findings, and because we are unable to select
between the written and oral memoranda of decision,
this case must be remanded for a new trial. On remand
the issue of whether the defendant requested counsel
must be relitigated. This is not a case where the state

has failed to meet its burden of production on an essential issue of fact. The trial court, as trier of fact, would clearly have been justified in believing the testimony of the state's witnesses that the defendant did not request counsel. Rather, the error in this case lies in the trial court's failure to state clearly and unequivocally the facts which it *did* find. As a result, this court is left with an inadequate record for review on appeal.

The issue of whether the defendant was unlawfully seized in violation of the fourth amendment must also be relitigated. The facts relating to the defendant's initial confrontation with police at the Eilerman home and the later events at the Manchester police station are integrally connected with the issues relating to the admissibility of his subsequent statements, and whether he requested counsel. Therefore, on remand this case must be tried de novo in its entirety.

## III

### EVIDENCE OF PAST MISCONDUCT

We next address the defendant's second claim of error. At trial, the state offered considerable evidence of child abuse, both toward the victim, Amy, as well as toward her sister, Christine, who was three years old at the time. None of this evidence directly related to the cause of death. The trial court, citing *State* v. *Tucker*, 181 Conn. 406, 435 A.2d 986 (1980), admitted the evidence on the issue of the defendant's intent to cause serious physical injury, an essential element of manslaughter in the first degree under the subsection charged. General Statutes § 53a-55 (a) (1).

In *State* v. *Tucker*, the defendant was charged with murder in connection with the death of an infant. The state's case was entirely circumstantial, and, on appeal, we found the evidence sufficient to support a jury finding that (1) the defendant was alone with the child

shortly before the child's death, (2) the child's injuries must have occurred during that time, and (3) the child's injuries were not caused accidentally. Id., 418–20. The state had also introduced evidence of the defendant's prior misconduct toward the child. We held that this evidence was admissible on the issue of intent. Id., 415–16. We stated that "[i]n battered child cases, the youth of the victim and the tendency of other family members not to intervene . . . make reasonable the exercise of judicial discretion to allow evidence of prior abusive treatment of the child victim." Id., 416–17. We further noted that "the exercise of wise discretion requires the trial court to consider whether other evidence, equally probative and less prejudicial, was available to the state." We found the absence of such an alternative in *Tucker* to lend "additional support to the action of the trial court" in admitting evidence of the uncharged misconduct. Id., 417.

In the present case, the defendant objected to the admission of prior misconduct evidence on several grounds, and he makes the identical claims on appeal. His first claim is based on his interpretation of our holding in *Tucker*. The defendant contends that, under *Tucker*, evidence of prior misconduct toward an infant victim is admissible *only* when the state has no other "equally probative and less prejudicial" evidence on the issue to which it is offered. We reject this interpretation. We indicated in *Tucker* that the availability of alternative evidence was a factor for the trial court to consider in its discretionary balancing of probative value and prejudicial effect. Notably, in *Tucker* itself, the state offered uncontroverted evidence that the "child died from a blunt injury or blow of considerable force"; id., 419; which, according to medical testimony, was unlikely to have been caused by accident. Id., 411. A trial court has wide discretion in determining relevance, and evidence is not made less relevant merely

because it is cumulative. Cumulative evidence is excludable on the entirely separate basis that it wastes valuable judicial time, but this is also a matter which we must entrust to the sound discretion of the trial court. We have expressly declined to adopt an "essential evidence standard" on the related issue concerning the admissibility of inflammatory crime-scene photography; *State* v. *DeJesus*, 194 Conn. 376, 381 n.6, 481 A.2d 1277 (1984); and, even with respect to evidence of other crimes, we have recognized that the admission of cumulative evidence does not generally constitute reversible error. *State* v. *Howard*, 187 Conn. 681, 688 n.4, 447 A.2d 1167 (1982). " ' "[T]he prosecution, with its burden of establishing guilt beyond a reasonable doubt, is not to be denied the right to prove every essential element of the crime by the most convincing evidence it is able to produce." ' " *State* v. *Falcon*, 196 Conn. 557, 566–67, 494 A.2d 1190 (1985); *State* v. *Smith*, 185 Conn. 63, 88, 441 A.2d 84 (1981). We therefore reject the defendant's claim that the evidence of misconduct should have been excluded because it was not the *only* evidence available on the issue of intent.

The defendant also objected at trial to the admission of evidence of injuries to Amy and her sister which were not shown to have been caused by him. Considering the volume of misconduct evidence introduced at trial, we do not attempt to address each ruling individually. Rather, we return to first principles. Before admitting evidence of other crimes or uncharged misconduct, the trial court must perform a discretionary balancing test. It must determine whether the probative value of the evidence outweighs its prejudicial tendency, and, if it does not, the evidence should be excluded. It cannot seriously be disputed that evidence of child abuse is highly prejudicial. Therefore, it is extremely important that the probative value of such evidence be clearly established.

Unless circumstances indicate otherwise, evidence that the defendant has intentionally abused the child victim in the past is probative on the issue of his intent to cause injury with respect to the crime charged. However, before such evidence can have *any* probative value, there must be a preliminary showing sufficient to support a jury finding that the defendant, in fact, caused the prior injury. The evidence of causation may be circumstantial or direct. For example, in the present case there was testimony that Amy and Christine suffered a higher incidence of "accidental" injury, resulting in facial bruises, whenever the defendant visited the Eilerman household. This testimony, by its very nature, supports a reasonable inference that the defendant caused these injuries. On the other hand, the trial court allowed testimony that the victim had suffered an injury to her kidney which was two weeks old at the time of death. Similarly, the trial court allowed testimony that Amy had several broken ribs which, according to the chief medical examiner, had occurred between two and six weeks before death. There was nothing in the record to indicate how or by whom these injuries were caused.

We have held in an analogous line of cases that it is reversible error for the trial court to allow into evidence articles seized from the defendant which tend to indicate criminal propensity when those articles are not connected to the commission of the crime charged. *State* v. *Girolamo,* 197 Conn. 201, 206, 496 A.2d 948 (1985) (weapons); *State* v. *Onofrio,* 179 Conn. 23, 31, 425 A.2d 560 (1979) (weapons); *State* v. *Acklin,* 171 Conn. 105, 115, 368 A.2d 212 (1976) (rope and stocking masks); *State* v. *Ferraro,* 160 Conn. 42, 45, 273 A.2d 694 (1970) (guns, ammunition, ski masks); *State* v. *Johnson,* 160 Conn. 28, 31, 273 A.2d 702 (1970) (dynamite). The rationale of these cases is that, "[a]bsent such a connection, the balance of scales

clearly tips against the probative value of the evidence." *State* v. *Onofrio,* supra, 31. In the present case the evidence of the broken ribs and kidney injury might have been relevant on the issue of intent had it been established that the defendant caused the injuries. Without this causal link, the evidence was highly inflammatory, without compensating relevance.

Without going into further detail, we may fairly characterize the evidence as portraying the victim and her sister as having been abused on numerous occasions, not always by the defendant. The natural inclination of any normal juror would be to hold someone responsible, and the trial court should have taken special care to minimize the prejudice inherent in this type of evidence. We do not suggest that the trial court was required to segregate by age or severity each individual bruise found on the victim and her sister as testified to by the state's witnesses. However, the proper exercise of discretion requires something beyond the wholesale admission of all such evidence offered by the state. " 'This court has consistently indicated that " ' "[a]ny improper evidence that may have a tendency to excite the passions, awaken the sympathy, or influence the judgment of the jury, cannot be considered as harmless." ' " ' " *State* v. *Girolamo,* supra, 206–207. The trial court clearly abused its discretion in admitting evidence of injuries, such as those to the victim's ribs and kidney, in the absence of any showing that they had been inflicted by the defendant.

There is error, the judgment is set aside, and a new trial is ordered.

In this opinion the other judges concurred.