STATE OF CONNECTICUT *v.* RAFAEL DELGADO
(AC 14296)

Lavery, Dupont and Freedman, Js.

Submitted May 1—officially released August 25, 1998

*Francis J. DiScala*, with whom were *Francis J. DiScala, Jr.*, and *John P. Thygerson*, for the appellant (defendant).

*Richard F. Jacobson*, assistant state's attorney, with whom, on the brief, were *Donald A. Browne*, state's attorney, and *Stephen J. Sedensky III*, assistant state's attorney, for the appellee (state).

*Opinion*

FREEDMAN, J. This matter is currently before us on remand from the Supreme Court. *State* v. *Delgado*, 243 Conn. 523, 707 A.2d 1 (1998). The defendant originally

appealed to this court from a judgment of conviction, rendered after a jury trial, of manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (1) and risk of injury to a child in violation of General Statutes § 53-21.

In his original appeal to this court, the defendant asserted that (1) the trial court improperly allowed joinder of the manslaughter and risk of injury counts, (2) the verdict was against the weight of the evidence, (3) the trial court improperly excluded the testimony of a defense expert witness due to an alleged violation of a sequestration order, (4) the trial court improperly admitted evidence of prior injuries to the victim, (5) the trial court's charge to the jury was misleading and confusing, resulting in the dilution of the state's burden of proof and (6) the trial court improperly allowed into evidence a videotape of the victim and her mother. We concluded that the evidence was sufficient to establish the defendant's guilt of the crimes charged. We further held, however, that the trial court improperly joined the manslaughter and risk of injury counts. Accordingly, we ordered a new trial and declined to afford the defendant review on the other issues. *State* v. *Delgado*, 42 Conn. App. 382, 681 A.2d 327 (1996), rev'd, 243 Conn. 523, 707 A.2d 1 (1998).

Our Supreme Court granted certification limited to the following issue: "Did the Appellate Court properly decide that the trial court had abused its discretion in the joinder of the manslaughter and risk of injury counts?" *State* v. *Delgado*, 239 Conn. 920, 682 A.2d 1008 (1996). The Supreme Court concluded that the trial court did not abuse its discretion in denying the defendant's motion to sever the manslaughter and risk of injury counts. *State* v. *Delgado*, supra, 243 Conn. 525. The Supreme Court, therefore, reversed the judgment of this court and remanded the case to us with direction

to consider the defendant's remaining claims on appeal. Id., 525 n.5.

The facts that the jury reasonably could have found are stated in both *State* v. *Delgado*, supra, 243 Conn. 523, and *State* v. *Delgado*, supra, 42 Conn. App. 382. Additional facts relevant to this appeal will be set forth as each of the defendant's remaining claims are addressed by this court.

I

The defendant first claims that the trial court abused its discretion in excluding the testimony of a defense expert witness due to an alleged violation of a sequestration order. The defendant argues that the exclusion of the defense witness violated the compulsory process clause of the sixth amendment[1] and the due process clause of the fourteenth amendment to the United States constitution.

The following facts are necessary to resolve this claim properly. Prior to the commencement of evidence, the trial court granted the state's motion for a sequestration order to apply to both the state and the defendant.[2] During the presentation of the defendant's case, the defendant sought to present as a witness Kwame Yeboa, a graduate of the University of Ghana in West Africa and the director of genetics at Columbia Presbyterian Medical Center. While testifying as to his credentials,

---

[1] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor . . . ."

[2] General Statutes § 54-85a provides: "In any criminal prosecution, the court, upon motion of the state or the defendant, shall cause any witness to be sequestered during the hearing on any issue or motion or any part of the trial of such prosecution in which he is not testifying."

Practice Book § 42-36 provides: "The judicial authority upon motion of the prosecuting authority or of the defendant shall cause any witness to be sequestered during the hearing on any issue or motion or during any part of the trial in which such witness is not testifying."

Yeboa indicated that he was board certified in pediatrics and clinical genetics. He then admitted that he had reviewed some of the testimony of Malka Shah, a prior witness presented by the state. The trial court thereafter granted, over the defendant's objection, the state's motion to exclude Yeboa's testimony because of the violation of the sequestration order.[3] According to the defendant, because Yeboa was precluded from testifying, the jury was not provided with an opportunity to hear an outstanding pediatrician, geneticist and expert in Down's syndrome testify on the defendant's behalf.

"The primary purpose of a sequestration order is to ensure that the defendant receives a fair trial by preventing witnesses from shaping their testimony to corroborate falsely the testimony of others. . . . Expert witnesses are not excepted under either the rule of practice or the statute and may be sequestered." (Citations omitted; internal quotation marks omitted.) *State* v. *Sherman*, 38 Conn. App. 371, 413, 662 A.2d 767, cert. denied, 235 Conn. 905, 665 A.2d 905 (1995). "Ordinarily, the remedy for violation of a sequestration order lies in the trial court's discretion. *State* v. *Falby*, 187 Conn. 6, 27, 444 A.2d 213 (1982). We acknowledge, however, that, under particular circumstances, the unjustified exclusion of a witness' testimony can amount to a deprivation of the defendant's right to present a defense. See, e.g., *Braswell* v. *Wainwright*, 463 F.2d 1148, 1155–56 (5th Cir. 1972) (holding that trial court's discretionary exclusion of sole corroborating witness' testimony denied defendant fundamental constitutional right)." *State* v. *Cavell*, 235 Conn. 711, 720, 670 A.2d 261 (1996).

"We acknowledge that experts are not fungible." Id. In this case, however, although the defendant was precluded from calling Yeboa as a witness, the defendant

[3] After further argument, the trial court reaffirmed its prior ruling and denied the defendant's request for a mistrial.

was able to present the testimony of three other qualified expert witnesses, all of whom testified as to the cause of the victim's death. The defendant presented the testimony of Salvador Castells.[4] At the time of trial, Castells testified that he was a professor of pediatrics at the State University of New York and that he was board certified in pediatrics. He stated that one of his main areas of research in the past few years was children with Down's syndrome.

Castells testified that the victim had an upper airway obstruction and abnormalities in the lungs, preventing her from breathing properly. Castells also testified that the victim had a seizure at the time of her death and that those three conditions caused her death.[5] He indicated that the victim would have had more bruises if she had been dropped or thrown to the floor.[6] Castells testified that the victim did not have a subdural hemorrhage on December 14, 1992. He indicated that the victim could have sustained the injury to her head by falling

[4] After attending college and medical school in Spain, Castells came to this country and did a pediatric internship at Sinai Hospital in Baltimore. He then did a two year residency at Jefferson Medical School in Philadelphia, followed by one year fellowships in metabolic and endocrine diseases at Yale University and Massachusetts Institute of Technology.

[5] The transcript discloses the following:

"Q. Now, is your opinion as to the cause of death based upon all the factors that you mentioned?

"A. Yes. I think being very specific on one, I think the cause of death was, this baby had upper airway obstruction. The baby also had abnormalities in the lungs so [s]he could not breathe properly and the baby had the seizure at the time of death. These three factors—conditions—severe lack of oxygen to the brain—they caused the death. . . .

"Q. And your opinions you stated as to the cause of death is due to a seizure; is that correct, doctor?

"A. Yes.

"Q. That was as to the fractured skull, is that right?

"A. Yes."

[6] The transcript discloses the following:

"Q. [Y]ou mentioned a few moments ago, in asking you about whether or not the baby could have been dropped or fallen fifteen feet or thrown

off the six inch mattress onto the floor. He also indicated that the victim could have had a seizure and then bumped her head on the floor, causing the lineal fracture. According to Castells, this was a misdiagnosed case of child abuse. He testified with a reasonable degree of medical certainty that the victim sustained her fracture as a result of a seizure or an accidental striking of her head.

Louis Roh, the deputy chief medical examiner for the County of Westchester, New York, also testified for the defendant. Roh attended the Medical College of Seoul National University in Korea.[7] He trained at the Bronx Veterans Hospital for four years, including two years of anatomic pathology and two years of clinical pathology. He then worked in the area of forensic pathology in the office of the New York City medical examiner. Roh worked there for one and one half-years before becoming an assistant medical examiner in Westchester County. He testified that he held board certification from the American Board of Pathology in forensic, anatomic and clinical pathology, and was a member of the National Association of Medical Examiners. At the time

to the floor or against the wall, that I believe you indicated that you would expect to see more than what you saw, is that right?

"A. We're talking about falling from ten feet?

"Q. Yes.

"A. Falling from ten feet—I mean ten feet is—I'm six feet—so it's a tremendous height. So you know if you talk about falling from a ten foot height, it will not be a linear fracture, it would be a much more complex fracture and also there would be bruising and swelling in the site of the fracture. This baby had only a linear fracture.

"Q. Would you also expect to find injuries to other parts of the body from a fall?

"A. Yeah, from ten feet, the baby will just not fall on the head. It would then rebound on the floor in other areas of the body. [S]he will have more bruises in other areas."

[7] When he came to the United States in 1968, Roh had a one year rotating internship at the New York Infirmary and a year of general surgical training at Jewish Memorial Hospital in New York City. He then went into the field of general pathology.

of trial, Roh was a clinical assistant professor at the University Medical College, where he taught pathology.

Roh testified that during the past twenty years he had performed more than six thousand autopsies, and had assisted in and observed another twenty thousand autopsies. Roh stated that the victim sustained the fracture of her skull and brain injuries as a result of a seizure on the night in question. Roh further explained that "while [the victim] was sleeping on the mattress she developed a seizure, convulsive attack. As a result, she fell off the mattress and then during the seizure activity her back of head was striking the flat, hard surface on the kitchen repeatedly, causing fracture of the skull on the back of the head and as a result there was injury to the brain and she became unresponsive and later on she died." Roh further testified that in his opinion, because of the absence of any cuts or bruises on the victim, her injury was not caused by being thrown to the floor.[8] Finally, Roh testified that this was not a case of battered child syndrome.

---

[8] The transcript discloses the following:

"Q. Doctor, in your opinion, could this injury, this fracture, have been caused in this case—was this injury caused by a fall or being thrown to the floor?

"A. My opinion is not.

"Q. Why not?

"A. If the child is thrown or dropped from that height, it can certainly produce fracture, but when that part of the back of the head strikes the floor from that distance, I would certainly expect to see cuts of the skin, back of the head or bruising of the back of the head on the skin area. In this case it was not present. That to me is indication of a—the baby having a seizure and the banging back of the head repeatedly on the flat surface.

"Q. In examining the medical evidence, was there any evidence of any bruise to the shoulder or the back area?

"A. No.

"Q. And would you expect that—there to be, had she fallen?

"A. If baby fell ten feet . . . I would certainly expect to see the bruising of the back of the head and shoulder and neck area where it comes to contact with the surface."

Louis Bader, a board certified diagnostic radiologist, also testified for the defendant.[9] Bader testified in support of the defendant's theory that the victim fractured her skull by banging her head on the floor.[10] Bader testified that, looking at the X rays of the victim, there was no subdural hemorrhage.

On the basis of that testimony, we conclude that even if the trial court's exclusion of Yeboa's testimony was an excessive sanction and therefore an abuse of discretion, it did not deprive the defendant of his right to present an effective defense, as the defendant was permitted to present three other qualified expert witnesses. The trial court's action therefore did not deprive the defendant of his constitutional rights. "Because we conclude that any impropriety . . . is nonconstitutional, the defendant bears the burden of demonstrating that

[9] After medical school, Bader interned for one year and then had a three year diagnostic radiology residency at New York Hospital, Cornell Medical Center. He was chief resident during his last year. In the 1980s, he was chairman of the department of radiology at Park City Hospital in Bridgeport. He then became director of radiology at Bridgeport Hospital for the Park Avenue facility. Bader had a clinical professorship appointment at Yale for a number of years.

[10] The transcript discloses the following:

"Q. Doctor, if a child sixteen months of age, in development six months, with Down's syndrome, weighing somewhere around seventeen to eighteen pounds, was sitting on the edge of a six inch mattress, say, from the floor, and while sitting, fell over backward, striking her head forcibly against the hard floor—the back of her head, could she—Do you have an opinion as to whether or not she could suffer a fractured skull?

"A. Yes.

"Q. And what is that opinion?

"A. Yes.

"Q. And doctor, if that same child as I've just described were lying on her back on a hard floor and had a seizure and struck her head repeatedly against that hard floor, do you have an opinion as to whether or not those acts of repeatedly striking of her head against the floor could cause a fracture of the back of her head?

"A. Yes.

"Q. And doctor, what is that opinion?

"A. Yes."

the trial court's [alleged] error caused him harm. . . . The standard for determining whether a nonconstitutional error is harmless is that [t]he defendant must show that it is more probable than not that the erroneous action of the court affected the result." (Citations omitted; internal quotation marks omitted.) *State* v. *Cavell*, supra, 235 Conn. 721–22. As previously noted, the defendant presented the testimony of three medical expert witnesses, Castells, Roh and Bader. Each of those experts provided compelling testimony on behalf of the defendant as to the cause of the victim's death. The defendant has not shown that it is more probable than not that the action of the trial court in excluding Yeboa's testimony affected the result of the case. The defendant, therefore, has failed to demonstrate that the exclusion of Yeboa's testimony, even if the trial court acted improperly, was harmful.

## II

The defendant next argues that the trial court abused its discretion in admitting evidence of prior injuries to the victim. According to the defendant, there was nothing in the record to indicate how or by whom the injuries were caused. The defendant claims that without a causal link to him, the evidence was highly inflammatory and lacked compensating probative value. We disagree.

The trial court admitted, over the defendant's objection, evidence that the victim had suffered a broken femur and had bruises on her face prior to her death. The defendant relies on *State* v. *Wilson*, 199 Conn. 417, 513 A.2d 620 (1986), in support of his claim that the trial court should have conducted a balancing test to determine whether the probative value of the evidence of the prior injuries outweighed its prejudicial tendency. In *Wilson*, the defendant, who was convicted of the manslaughter of an infant girl, objected to the admission

of evidence of prior injuries that the victim and her sister had suffered. The trial court had admitted the evidence on the issue of intent to cause serious physical injury, an essential element of manslaughter in the first degree. The defendant argued that there was no evidence that the defendant had caused these prior injuries. Our Supreme Court held that "before such evidence can have *any* probative value, there must be a preliminary showing sufficient to support a jury finding that the defendant, in fact, caused the prior injury." (Emphasis in original.) Id., 449.

*State* v. *Wilson*, supra, 199 Conn. 417, is distinguishable from the present case, however, because in *Wilson* the defendant was charged only with manslaughter in the first degree. In the present case, the defendant was charged with manslaughter *and* risk of injury to a child in violation of General Statutes § 53-21. Specifically, with regard to the risk of injury count, the defendant was charged with "wilfully and unlawfully caus[ing] and permit[ting] [the victim] . . . to be placed in a situation that the child's health was likely to be impaired." Thus, the defendant was not charged under § 53-21 with doing an act likely to impair the health or morals of a child. The evidence of the prior injuries that the victim had suffered was clearly relevant and admissible on the issue of whether the defendant had caused or permitted the victim to be placed in a situation in which her health was likely to be impaired. The trial court, therefore, did not abuse its discretion in admitting that evidence.[11]

---

[11] We find equally unavailing the defendant's related claim that according to trial testimony, the victim might have sustained the fractured femur prior to November 1, 1992, the date from which the risk of injury count runs. The information charging the defendant with risk of injury to a child specifies that the defendant committed this crime "during approximately November 1, 1992, to December 14, 1992." "The state has a duty to inform a defendant, within reasonable limits, of the time when the offense charged was alleged to have been committed. The state does not have a duty, however, to disclose information which the state does not have. Neither the sixth amendment

## III

The defendant next argues that the trial court's charge on causation was misleading and confusing, resulting in a dilution of the state's burden of proof. The defendant claims that his due process rights were violated by the charge. The defendant concedes that this claimed error is unpreserved, but requests that this court review the claim pursuant to *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989).[12]

We initially note that the record is adequate to review the alleged claim of error, and the claim is of constitutional magnitude alleging the violation of a fundamental right. "An accused has a fundamental right, protected by the due process clauses of the federal and Connecticut constitutions, to be acquitted unless proven guilty of each element of the charged offense beyond a reasonable doubt. . . . This court has consistently held that a claim that the judge improperly instructed the jury on an element of an offense is appealable even if not raised at trial." (Citations omitted; internal quotation marks omitted.) *State* v. *Williams*, 202 Conn. 349, 363, 521 A.2d 150 (1987). The defendant has, therefore, satisfied the first and second prongs of *Golding*. We must next consider whether the defendant has satisfied his burden as to the third requirement of *Golding*, i.e., that the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial.

[to] the United States constitution nor article first, § 8 of the Connecticut constitution requires that the state choose a particular moment as the time of an offense when the best information available to the state is imprecise." (Internal quotation marks omitted.) *State* v. *Spigarolo*, 210 Conn. 359, 386, 556 A.2d 112, cert. denied, 493 U.S. 933, 110 S. Ct. 322, 107 L. Ed. 2d 312 (1989).

[12] The defendant can prevail pursuant to *Golding* only if "(1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." *State* v. *Golding*, supra, 213 Conn. 239–40.

"At the outset, we note that under . . . *Golding*, a defendant may prevail on an unpreserved constitutional claim of instructional error only if, considering the substance of the charge rather than the form of what was said, it is reasonably possible that the jury was misled. . . . In determining whether the jury was misled, [i]t is well established that [a] charge to the jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but is to be considered rather as to its probable effect upon the jury in guiding them to a correct verdict in the case. . . . The charge is to be read as a whole and individual instructions are not to be judged in artificial isolation from the overall charge. . . . The test to be applied to any part of a charge is whether the charge, considered as a whole, presents the case to the jury so that no injustice will result. . . . Furthermore, [a] jury instruction is constitutionally adequate if it provides the jurors with a clear understanding of the elements of the crime charged, and affords them proper guidance for their determination of whether those elements were present. *State* v. *Pearsall*, [44 Conn. App. 62, 68, 687 A.2d 1301, cert. denied, 240 Conn. 910, 689 A.2d 473 (1997)]." (Internal quotation marks omitted.) *State* v. *Adorno*, 45 Conn. App. 187, 198, 695 A.2d 6, cert. denied, 242 Conn. 904, 697 A.2d 688 (1997).

The defendant specifically takes issue with the trial court's charge that the causation requirement is satisfied as long as the defendant's actions were "*a* sufficiently direct cause of the ensuing death" and that "the defendant's actions must have *contributed* to [the victim's] death." (Emphasis added.) The defendant additionally challenges the following language: "In many situations giving rise to criminal liability, the harm . . . is unintended yet it is directly or indirectly caused by an act of the defendant. In such cases, where the death or injury caused by the defendant's conduct is a foreseeable and natural result of that conduct, the law . . .

holds the defendant criminally responsible." Finally, the defendant claims that the trial court improperly failed to inform the jury that the defendant's conduct could have been superseded by an efficient intervening cause.[13]

---

[13] The trial court charged regarding causation as follows: "Causation. With regard to either one of the manslaughter in the first degree charges, the state must prove that the defendant caused the death of [the victim]. This means that the defendant's conduct was the proximate cause of the victim's death. An act or omission to act is the proximate cause of death when it substantially and materially contributes in a natural and continuous sequence, unbroken by an intervening cause to the resulting death. It is the cause without which the death would not have occurred and it is the predominating cause, the substantial factor from which death followed as a natural, direct and immediate consequence.

"It is not necessary that the particular kind of harm that results from the defendant's act be intended by him. Where the death or injury caused by the defendant's conduct is a foreseeable and natural result of that conduct, the law considers the chain of legal causation unbroken and holds the defendant criminally responsible. This means that the defendant's actions must have contributed to [the victim's] death.

"It is unnecessary for proximate cause purposes that the particular kind of harm that results from the defendant's act be intended by him. In this case with these charges the state does not have to prove that the defendant intended to kill [the victim]. In many situations giving rise to criminal liability, the harm that results is unintended, yet it is directly or indirectly caused by an act of the defendant. In such cases, where the death or injury caused by the defendant's conduct is a foreseeable and natural result of that conduct, the law considers the chain of legal causation unbroken and holds the defendant criminally responsible."

On the specific charge on manslaughter in the first degree in violation of § 53a-55 (a) (1), the court charged in part as follows: "In order to find the defendant guilty of this crime, the state is required to prove beyond a reasonable doubt each of the following elements: first, that the defendant caused the death of [the victim]. This requires that the defendant's actions must be a sufficiently direct cause of the ensuing death before there can be any imposition of criminal liability. . . . Therefore, in order for the defendant to be found guilty of the charge of manslaughter in the first degree, you must find beyond a reasonable doubt that he intended to cause serious physical injury to [the victim] and that [the victim] died as a result of the actions of the defendant. If you find that the state has failed to prove any one of these elements, you must find the defendant not guilty."

After the jury began deliberations, it requested that the trial court reread, inter alia, the charge on § 53a-55 (a) (1). In response to this request, the trial court reread its previous charge.

In *State* v. *Leroy*, 232 Conn. 1, 13, 653 A.2d 161 (1995), our Supreme Court stated that "a jury instruction with respect to proximate cause must contain, at a minimum, the following elements: (1) an indication that the defendant's conduct must contribute substantially and materially, in a direct manner, to the victim's injuries; and (2) an indication that the defendant's conduct cannot have been superseded by an efficient, intervening cause that produced the injuries." As to the first element, the trial court properly charged the jury that "[w]ith regard to either one of the manslaughter in the first degree charges, the state must prove that the defendant caused the death of [the victim]. This means that the defendant's conduct was the proximate cause of the victim's death. An act or omission to act is the proximate cause of death when it substantially and materially contributes in a natural and continuous sequence, unbroken by an intervening cause to the resulting death. It is the cause without which the death would not have occurred and it is the predominating cause, the substantial factor from which death followed as a natural, direct and immediate consequence." The trial court's definition of proximate cause is virtually identical to the one given by our Supreme Court in *State* v. *Wassil*, 233 Conn. 174, 181–82, 658 A.2d 548 (1995). The court, therefore, properly instructed the jury regarding the first element of causation. Reading the charge as a whole, it is not reasonably possible that the jury was misled by this charge.

As to the second element, the defendant argues in his brief that the actions of the emergency medical technicians in transporting the victim to the hospital might have been an efficient, intervening cause of the victim's death.[14] The defendant, however, did not present this theory as a defense, and no witnesses testified

---

[11] Specifically, the defendant refers to the testimony of John Corris, the paramedic who treated the victim. Corris indicated that the victim was

that the handling of the victim by the emergency personnel was a cause of her death. The defendant's constant theory was that the victim suffered a seizure on the night in question, causing her to fall off her mattress and strike her head on the floor. Regarding the element of an efficient, intervening cause, our Supreme Court has stated as follows: "We emphasize that, as *State* v. *Leroy*, supra, 232 Conn. 13, suggests, the requirement of language in the jury instructions regarding an efficient, intervening cause is not ironclad. It arises in those cases in which the evidence could support a finding by the jury that the defendant's conduct was overcome by an efficient, intervening cause, or in which the evidence regarding proximate causation was such that, based on the doctrine of efficient, intervening cause, the jury could have a reasonable doubt about the defendant's guilt. Thus, in the general run of cases, in which the evidence is susceptible of a finding of only one cause of harm contemplated by the statute, a statement in the jury instruction referring to an efficient, intervening cause might well be unnecessary." *State* v. *Munoz*, 233 Conn. 106, 121–22 n.8, 659 A.2d 683 (1995). We conclude, on the facts of this case, that a charge on an efficient, intervening cause of the victim's death was unnecessary.

IV

The defendant's final claim is that the trial court abused its discretion by allowing into evidence, over objection, a videotape of the victim and her mother. The defendant claims that the admission of the videotape resulted in a denial of his constitutional rights to confrontation and a fair trial.

We note that although the defendant did object to the introduction of the videotape at trial, he did so on

placed on a wooden short board prior to being transported to the hospital. Corris also stated that he told his partner, the driver of the ambulance, "Let's hit it."

the ground that its introduction was prejudicial and inflammatory. The defendant did not argue before the trial court that the introduction of the videotape violated his constitutional rights to confrontation and a fair trial. Furthermore, the defendant has not requested that we review this unpreserved claim pursuant to *State* v. *Golding,* supra, 213 Conn. 239–40. "In the absence of such a request, we have, in the past, declined to review a defendant's claim under similar circumstances." (Internal quotation marks omitted.) *State* v. *Casado,* 42 Conn. App. 371, 374, 680 A.2d 981, cert. denied, 239 Conn. 920, 682 A.2d 1006 (1996). We decline, therefore, to grant review of the defendant's claim under *Golding.* We further decline to review this claim under the plain error doctrine[15] because we do not find that the admission of the videotape affected the fairness or integrity of the proceedings or resulted in manifest injustice to the defendant.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[15] Practice Book § 60-5 provides in relevant part: "The court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. The court may in the interests of justice notice plain error not brought to the attention of the trial court. . . ."

"Where a trial court's action does not result in any manifest injustice, a defendant's claim under the plain error doctrine does not warrant review." (Internal quotation marks omitted.) *State* v. *Sivri,* 46 Conn. App. 578, 590, 700 A.2d 96, cert. denied, 243 Conn. 938, 702 A.2d 644 (1997).