661 S.E.2d 354

**Regina Denise McKNIGHT, Petitioner,**

v.

**STATE of South Carolina, Respondent.**

No. 26484.

Supreme Court of South Carolina.

Submitted April 1, 2008.

Decided May 12, 2008.

---

38

C. Rauch Wise, of Greenwood, Julie M. Carpenter and Matthew Hersh, both of Jenner & Block, of Washington, D.C., for Petitioner.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald Zelenka, and Assistant Attorney General Melody J. Brown, all of Columbia, for Respondent.

Susan King Dunn, of Charleston, Tiloma Jayasinghe and Lynn M. Paltrow, both of National Advocates for Pregnant Women, of New York, NY, Theshia Naidoo and Daniel N. Abrahamson, both of The Drug Policy Alliance, of Berkeley, CA, for Amici Curiae.

Chief Justice TOAL:

In this case, the post-conviction relief (PCR) court denied Petitioner's application alleging numerous grounds for ineffective assistance of counsel. This Court granted certiorari and we reverse the PCR court's denial of relief on several grounds.

## FACTUAL/PROCEDURAL BACKGROUND

Petitioner Regina McKnight gave birth to a nearly full-term stillborn baby girl in May 1999. An autopsy revealed inflammations in the placenta and umbilical cord respectively known as chorioamnionitis and funisitis, as well as the presence of benzoylecgonine (BZE), a by-product of cocaine. The autopsy report concluded that death occurred one to two days earlier "secondary to chorioamnionitis, funisitis and cocaine consumption" and labeled the baby's death a homicide. McKnight was subsequently charged with homicide by child abuse pursuant to S.C.Code Ann. § 16–3–85 (2003).

The public defender for Horry County represented McKnight in each of two trials for homicide by child abuse. The first trial in January 2001 ended in a mistrial. At the second trial in May 2001, a jury convicted McKnight of homicide by child abuse. This Court affirmed the jury's verdict on direct appeal. *See State v. McKnight*, 352 S.C. 635, 576 S.E.2d 168 (2003).

McKnight filed a petition for PCR alleging ineffective assistance of counsel on numerous grounds. The PCR court held that counsel was not ineffective and denied McKnight relief as to each of her claims. This Court granted certiorari to review the PCR court's decision, and McKnight raises the following issues for review:

I. Did the PCR court err in determining that counsel was not ineffective for failing to prepare an adequate defense?

II. Did the PCR court err in determining that counsel was not ineffective in failing to ensure the trial court gave proper jury instructions?

III. Did the PCR court err in determining that counsel was not ineffective for failing to move to dismiss the charges on the grounds that the disparity between the

sentences for criminal abortion and homicide by child abuse violates the Equal Protection Clause?

IV. Did the PCR court err in determining that counsel was not ineffective in failing to introduce the autopsy report into evidence?

V. Did the PCR court err in determining counsel was not ineffective in failing to argue the issue of intent during the closing argument?

VI. Did the PCR court err in excluding expert testimony on the standards of practice for South Carolina defense lawyers?

## STANDARD OF REVIEW

In order to establish a claim of ineffective assistance of counsel, a PCR applicant must prove: (1) counsel failed to render reasonably effective assistance under prevailing professional norms; and (2) counsel's deficient performance prejudiced the applicant's case. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Butler v. State,* 286 S.C. 441, 442, 334 S.E.2d 813, 814 (1985). In reviewing the PCR court's decision, this Court is concerned only with whether any evidence of probative value exists to support the decision. *Smith v. State,* 369 S.C. 135, 138, 631 S.E.2d 260, 261 (2006). If no probative evidence exists to support the PCR court's findings, this Court will reverse. *Pierce v. State,* 338 S.C. 139, 144, 526 S.E.2d 222, 225 (2000).

## LAW/ANALYSIS

### I. Failure to prepare an adequate defense

McKnight argues that counsel was ineffective in her preparation of McKnight's defense through expert testimony and cross-examination. We agree.

The analysis of this issue begins with a summary of the parties' strategies at the first trial. At this trial, the State tendered Dr. Edward Proctor, the pathologist who performed the autopsy, to opine as to the cause of death. Consistent with his autopsy report, Dr. Proctor testified that the chorioamnionitis and the funisitis in conjunction with cocaine caused the fetus to die. The doctor said that he based his finding of

cocaine on the presence of the cocaine metabolite BZE in the fetus and attributed his failure to otherwise find any of the typical physiological effects of cocaine on the fetus's central nervous system to post-mortem decomposition. Although Dr. Proctor made general statements on the lethal effects of maternal cocaine consumption on fetuses, he also admitted it was possible for chorioamnionitis or funisitis alone to have caused the death of McKnight's fetus. Dr. Brett Woodard, an expert in pediatric pathology and the State's second witness on the issue, testified that by ruling out other possible causes of death, including syphilis,[1] thyroid problems, or other substance use, it was his opinion that McKnight's cocaine use alone caused the chorioamnionitis and funisitis in the fetus which resulted in fetal death. Dr. Woodard further based his conclusions on studies to which he extensively cited for their conclusions on the harmful effects of cocaine *in utero.*

Counsel for McKnight called two expert witnesses to testify as to possible alternative causes of death. Dr. Steven Karch, a cardiac pathologist and expert in drug-related deaths, opined that although he could not determine the underlying cause of the chorioamnionitis and funisitis found in the fetus, these conditions alone were responsible for its death. Dr. Karch explained that in the absence of pure-form cocaine in the fetus, the only conclusion he could make from the presence of BZE was that the mother was a cocaine user. The doctor additionally testified that it was impossible to rule out syphilis as a cause of death.

Dr. Karch also rebutted the State's experts' testimony on the harmful effects of cocaine and the notion of "crack babies" by explaining at great length that although cocaine is a potentially dangerous drug, it is not as dangerous as the medical community once believed. Dr. Karch went on to describe recent studies which had been unable to conclusively link cocaine to stillbirth, and discussed the flaws in earlier studies that had shown otherwise.[2] The doctor further cited

---

1. Although not listed as a cause of death on the autopsy report, McKnight had a history of syphilis, which has been known to result in stillbirth.

2. This is a very general summary of the expert testimony on the issue and we reiterate that neither expert was claiming that cocaine will not

this research to supplement his explanation as to why particular natural causes could not be ruled out as having caused fetal death.

Counsel for McKnight also called Dr. Sandra Conradi, a pathologist at MUSC, to testify on the cause of death. Similar to Dr. Karch, Dr. Conradi rebutted the State's testimony on the harmful effects of cocaine by pointing to a published medical study showing fetal exposure to levels of cocaine even higher than McKnight's fetus was no more likely to give rise to an adverse pregnancy than exposure to other harmful conditions. Dr. Conradi also stated that she would have ruled the cause of death "undetermined," rather than a homicide. However, upon further questioning, the doctor eliminated all potential natural causes of death, testifying that it was "unlikely, but possible" that the chorioamnionitis and funisitis led to stillbirth and that her tests for syphilis were negative. On the other hand, Dr. Conradi testified that she could not rule out cocaine as a cause of death.

In its closing argument at the first trial, the State initially focused on the testimony of its expert, Dr. Woodard, the sole expert to testify that cocaine alone caused the fetal demise. The State concentrated the remainder of its closing argument on Dr. Conradi's testimony, repeatedly emphasizing that McKnight's own expert had eliminated all potential causes of death except exposure to cocaine. The jury deliberated for over seven hours without reaching a verdict and was sent home for the night. The next morning, upon learning that several jurors had researched medical issues related to the case on the internet overnight, the trial court declared a mistrial.

At the second trial in May 2001, the State again called Dr. Proctor and Dr. Woodard[3] to testify to their belief that cocaine caused baby McKnight's stillbirth. Counsel for McKnight did not call Dr. Karch back to testify and only

harm a fetus. Rather, the thrust of the testimony was to emphasize the doctors' recognition of recent studies showing that cocaine is no more harmful to a fetus than nicotine use, poor nutrition, lack of prenatal care, or other conditions commonly associated with the urban poor.

3. Dr. Woodard's testimony was videotaped prior to trial because he was unable appear in person.

called Dr. Conradi, who again testified that although she could not precisely determine the cause of death, neither chorioamnionitis, funisitis, nor syphilis caused the fetus to die. Counsel did not examine Dr. Conradi on the published study favorable to McKnight's defense that the doctor had mentioned at the first trial. Furthermore, counsel did not call any other expert to rebut or discredit the medical studies cited by the State's experts as Dr. Karch had done previously, nor did counsel cross-examine the State's experts on the matter.

As in the closing arguments of the first trial, the State began by pointing out Dr. Conradi's failure to eliminate cocaine as a cause of fetal demise and declared that in conjunction with the testimony of Dr. Woodard, Dr. Conradi "really helped us out in figuring out the cause of death in this particular case" by eliminating all other relevant causes of death. The jury returned a guilty verdict in thirty minutes.

### a. Expert witnesses

McKnight argues that counsel was ineffective in calling an expert witness whose testimony undermined the defense and in failing to call an expert witness whose testimony supported the defense. We agree.

There is a strong presumption that counsel rendered adequate assistance and exercised reasonable professional judgment in making all significant decisions in a case. *Caprood v. State*, 338 S.C. 103, 109, 525 S.E.2d 514, 517 (2000). Where trial counsel articulates a valid reason for employing certain trial strategy, counsel will not be deemed ineffective. *Roseboro v. State*, 317 S.C. 292, 294, 454 S.E.2d 312, 313 (1995).

In the instant case, upon learning that an extended trip abroad would prevent Dr. Karch from testifying at the second trial, counsel stated at the PCR hearing that she believed at the time of trial that Dr. Conradi's testimony alone would be sufficient. Specifically, counsel testified that at trial, she focused solely on the issue of whether cocaine caused the stillbirth, and therefore, determined that Dr. Conradi's testimony—which never pinned the death on cocaine, but rather, labeled the cause of death as "undetermined" in the absence of pure-form cocaine in the fetus—supported the defense's theo-

ry. For this reason, counsel testified that she never thought to request a continuance or elicit Dr. Karch's testimony via videotape as the State had with Dr. Woodard. Counsel also admitted that due to her case load, she did not have time to find another expert who could, as Dr. Karch did, effectively rule out cocaine as the cause of death.[4]

We find that it was unreasonable for counsel to produce a single expert witness at the second trial whose testimony had clearly benefitted the State's case in the first trial, and that her reasons for doing so do not qualify as a valid trial strategy.[5] Counsel's case files from the first trial no doubt indicated that the State had based its theory of the case on McKnight's history of cocaine use and being able to rule out all other potential causes of death. Counsel was also certainly aware that Dr. Conradi's process of ruling out all other potential natural causes of death to arrive at an opinion on the actual cause of death mimicked that of the State's expert Dr. Woodard. Although Dr. Conradi ultimately concluded that the cause of death was indeterminable while Dr. Woodard concluded that cocaine caused fetal demise, counsel was certainly cognizant of the fact that the State's closing argument at the first trial used these experts' similar methods of analysis to its advantage. From this, counsel should have reasonably concluded that regardless of Dr. Conradi's ultimate conclusion, her testimony went to the heart of the State's case, and that substitute and/or additional testimony was needed. *See Ingle v. State*, 348 S.C. 467, 560 S.E.2d 401 (2002) (finding ineffective assistance of counsel where defense counsel called a witness whose testimony contradicted the defense's theory of the case).

Furthermore, Petitioner showed that even if Dr. Karch was unavailable, another expert was available to testify that cocaine did not cause the stillbirth. Dr. Kimberly Collins, head

---

4. Counsel is the public defender for Horry County. She testified that between the two McKnight trials, she tried a death penalty case in addition to working on about two hundred other cases assigned to the public defender's office.

5. Counsel herself admitted at the PCR hearing that Dr. Conradi's testimony had been harmful to McKnight's case and that failing to call back Dr. Karch, who counsel considered "a very effective witness," was pure oversight and not a strategic decision on her part.

of forensic pathology at MUSC and an expert witness in numerous cases, testified at the PCR hearing that she agreed with Dr. Karch's view of the evidence and would have testified on behalf of McKnight at the second trial had she been contacted by counsel. This Court has recognized that strategic choices made by counsel after an incomplete investigation are reasonable "only to the extent that reasonable professional judgment supports the limitations on the investigation." *See Von Dohlen v. State,* 360 S.C. 598, 607, 602 S.E.2d 738, 743 (2004) (quoting *Wiggins v. Smith,* 539 U.S. 510, 533, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003)). Although we accept counsel's assertion that she was pressed for time in preparing for the second trial, in light of counsel's familiarity with the first trial and the relative ease with which counsel could have procured favorable expert testimony at the second trial, we conclude that counsel's decision to call Dr. Conradi alone to testify at the second trial was unreasonable.

We further find that there is a reasonable probability that this deficiency prejudiced McKnight. The methodology used by the *only* expert witness for the defense in determining the cause of fetal death mimicked that of the State's star expert and, in this way, Dr. Conradi's testimony primarily served to bolster the State's theory of the case excluding all other potential causes of death in order to conclude that cocaine caused the stillbirth. In this regard, the Court's own review of the case on direct appeal shows that counsel's deficient performance was in fact prejudicial. On appeal, this Court upheld the jury verdict on numerous grounds, including that sufficient evidence existed to show that cocaine caused fetal demise. In reaching this conclusion, the Court emphasized Dr. Woodard's testimony ruling out other natural causes of death and pointed out that "McKnight's expert . . . also ruled out the possibility of choriamnionitis, funisitis or syphilis as the cause of death." *McKnight,* 352 S.C. at 643–44, 576 S.E.2d at 172.

In our opinion, counsel's two-fold error in calling an expert witness whose testimony was known to have previously been used to bolster the State's case, while neglecting to elicit favorable testimony from other experts when such testimony was known to exist and readily available, represents counsel's inadequate preparation for trial rather than a valid trial

strategy. Accordingly, we find that counsel's performance in this regard was deficient. Because we further find that this deficient performance prejudiced McKnight's case, we hold that the PCR court erred in determining that counsel was not ineffective on these grounds.

### b. Failure to investigate

McKnight also argues that counsel was ineffective in failing to investigate medical evidence contradicting the State's experts' testimony on the link between cocaine and stillbirth, and in further failing to investigate methods to challenge Dr. Woodard's conclusions ruling out natural causes of death. We agree.

A criminal defense attorney has the duty to conduct a reasonable investigation to discover all reasonably available mitigation evidence and all reasonably available evidence tending to rebut any aggravating evidence introduced by the State. *Nance v. Ozmint*, 367 S.C. 547, 557 n. 8, 626 S.E.2d 878, 883 n. 8 (2006) (quoting *Wiggins*, 539 U.S. at 524–25, 123 S.Ct. 2527). In this case, counsel testified that her failure to rebut the medical research cited by the State's experts, as well as the State's expert's own methods in arriving at those conclusions—either through the defense's own expert testimony or with a thorough cross-examination—was due to her belief that Dr. Conradi's testimony alone was adequate and that she did not otherwise have time to interview additional experts. Counsel, however, did not attempt to rebut the medical studies she knew the State's experts would cite, nor did she examine Dr. Conradi on the study the doctor cited at the first trial that concluded cocaine is no more harmful to fetuses than other adverse factors during pregnancy. In light of counsel's thorough investigation and examination of witnesses at the first trial, counsel, in our view, was deficient in failing to conduct a reasonable investigation which resulted in a substantially weaker defense at the second trial.

Furthermore, in the absence of testimony from the defense on medical research to the contrary, there is a reasonable probability that the jury used the adverse and apparently outdated scientific studies propounded by the State's witnesses to find additional support for the State's experts'

conclusions that cocaine caused the death of the fetus. Accordingly, we hold that the PCR court erred in determining that counsel was not ineffective on these grounds

## II. Jury instructions

### a. Criminal intent under the Homicide by Child Abuse statute

■ McKnight argues that counsel was ineffective in failing to object to the trial court's charge on the measure of criminal intent required for conviction under the Homicide by Child Abuse (HCA) statute. We agree.

Under S.C.Code Ann. § 16–3–85(a)(1) (2003), a person is guilty of homicide by child abuse if the person causes the death of a child "while committing child abuse or neglect, and the death occurs under circumstances manifesting an extreme indifference to human life." At trial, the trial court began by instructing the jury, in accordance with the HCA statute, that the State must prove beyond a reasonable doubt that "death occurred in circumstances showing extreme indifference to human life." The court continued with the general charge on criminal intent from the Circuit Court Bench Book. Specifically, the court explained:

In any case in order to establish criminal liability criminal intent is required. For example, the mental state required to be proven by the State for a part[icular] [sic] crime might be purpose, intent, knowledge, recklessness, or criminal negligence. . . . Criminal intent is a mental state, a conscious wrongdoing. It is up to you to determine what the defendant intended to do based on the circumstances shown to have existed. Criminal intent can arise from actions or failure to act. It may arise from negligence, recklessness or indifference to duty or consequences therefore. It is considered by law to be the equivalent of criminal intent.

Ten minutes after dismissing the jury for deliberations, the jury asked, "Can we have a definition of criminal intent? If we do have to confirm criminal intent?" The court then recharged the jury, again using the general charge on criminal intent. Counsel for McKnight did not object to either the primary charge or the supplemental charge.

McKnight argues that trial court improperly charged the jury that it could convict if it found negligence, recklessness, or mere indifference when a conviction for homicide by child abuse requires a finding of extreme indifference to human life. For purposes of the HCA statute, "extreme indifference" has been defined as "a mental state akin to intent characterized by a deliberate act culminating in death." *State v. Jarrell,* 350 S.C. 90, 98, 564 S.E.2d 362, 367 (Ct.App.2002). In a similar vein, this Court has held that "reckless disregard for the safety of others" in reckless homicide cases is "a conscious failure to exercise due care or ordinary care or a conscious indifference to the rights and safety of others or a reckless disregard thereof." *State v. Tucker,* 273 S.C. 736, 739, 259 S.E.2d 414, 415 (1979). Accordingly, the specification of the *mens rea* in the HCA statute in conjunction with the general charge on criminal intent was proper and counsel was not deficient in failing to object to the primary charge.

However, the propriety of using the general criminal intent charge alone in the supplemental charge is not so clear. The foreman's note appears to question what specific level of criminal intent was required to find McKnight guilty, indicating that the jury was confused on this point. Although the references in the criminal intent charge to recklessness and indifference are consistent with this Court's HCA jurisprudence regarding the meaning of "extreme indifference to human life," we believe that the trial court's recitation of the general criminal intent charge alone in response to the jury's inquiry only served to further confuse the jury by referencing mere negligence and otherwise failing to clarify the particular mental state required for a conviction of homicide by child abuse. *See State v. Blurton,* 352 S.C. 203, 208, 573 S.E.2d 802, 804 (2002) ("Instructions that do not fit the facts of the case may serve only to confuse the jury.") *and State v. Rothell,* 301 S.C. 168, 169–70, 391 S.E.2d 228, 229 (1990) ("It is error to give instructions which may confuse or mislead the jury."). Accordingly, we find that counsel was deficient in failing to object to the supplemental charge.

Furthermore, because the erroneous charge occurred in a supplemental instruction and likely attained a special significance in the minds of the jurors, there is a reasonable probability that counsel's deficient performance prejudiced

McKnight. *See Lowry v. State,* 376 S.C. 499, 657 S.E.2d 760 (2008) (acknowledging the prominence of an erroneous charge when it arises in a supplemental instruction). That the jury returned a guilty verdict five minutes after the trial court issued the supplemental charge indicates that counsel's failure to object to the erroneous charge was prejudicial in fact. Accordingly, we hold that the PCR court erred in determining that counsel was not ineffective on these grounds.

### b. Burden of proving an alternative cause of death

McKnight argues that counsel was ineffective in failing to request that the jury be instructed that the defense did not have the burden to prove an alternative cause of death. We disagree.

This Court has never addressed whether a defendant is entitled, upon request, to a charge that the defense has no burden of proving an alternative cause of death, and McKnight appears to argue that the Court should adopt a rule similar to that applicable to the affirmative defense of self-defense. When self-defense is at issue in a case, the defendant, upon request, is entitled to a charge that the State has the burden of disproving self-defense beyond a reasonable doubt. *State v. Addison,* 343 S.C. 290, 294, 540 S.E.2d 449, 451 (2000). Numerous other jurisdictions ascribe to this rule and the Fourth Circuit has commented that "jury instructions regarding self-defense pose a delicate problem requiring extraordinary caution because the defense admits the accused committed the act but seeks to establish justification or excuse. This is especially true where self-defense is the only defense alleged at trial." *Guthrie v. Warden,* 683 F.2d 820, 825 n. 7 (4th Cir.1982) (citing *United States v. Corrigan,* 548 F.2d 879 (10th Cir. 1977)).

This Court has articulated that the primary reason for entitling a defendant to a self-defense charge upon request in South Carolina is because at one time in our jurisprudence, self-defense was an affirmative defense which the defendant was required to prove beyond a reasonable doubt. *See Addison,* 343 S.C. at 293, 540 S.E.2d at 451. Requesting a self-defense charge on the State's burden of proof therefore ensures that the jury does not proceed on the outdated theory of

self-defense as an affirmative defense. Because asserting an alternative theory of death is not, and never has been, an affirmative defense required to be proven by the defendant, we find no similar entitlement to such charge, and therefore, counsel's failure to request such was not unreasonable.

Nor could this Court find that the theoretical concerns underlying a self-defense charge outlined in *Guthrie* are of equal concern where a defendant asserts an alternative theory of death. For instance, in this particular case, McKnight only admits to child abuse (using cocaine while pregnant). She affirmatively denies the crime of homicide by child abuse for which she is being tried by asserting alternative theories (natural causes) for the cause of the fetus's death. We find the *Guthrie* rationale for a self-defense charge request is not at issue when a defendant asserts an alternative theory of death because the defendant in such cases is not seeking justification or an excuse for committing the crime for which they are being tried; rather, the defendant is saying he or she is innocent.

Even if this Court were to find McKnight was entitled to such a charge upon request, counsel's failure to request the charge must still be evaluated for prejudicial effect. In this case, the trial court's instructions referenced the State's burden to prove McKnight guilty beyond a reasonable doubt on numerous occasions, and reiterated that McKnight was "not required to prove herself innocent." When read as a whole, the instructions adequately conveyed the State's burden of proof beyond a reasonable doubt and the corresponding absence of any such burden for McKnight.[6] *See State v. Burkhart*, 350 S.C. 252, 263, 565 S.E.2d 298, 304 (2002) (noting that failure to give requested jury instructions is not prejudicial

---

6. "Intervening cause" instructions have been requested in other jurisdictions to address alternative theories of death in child abuse cases. Although no cases are directly on point, other courts have held that in the absence of a specific charge on intervening causes, a jury instruction that, on the whole, adequately conveys the government's burden of proof beyond a reasonable doubt under the applicable criminal statute is not grounds for reversal. *See, e.g., State v. Delgado*, 50 Conn.App. 159, 718 A.2d 437, 445 (2003) (finding a jury charge on intervening causes unnecessary in a case involving the death of a child in which the evidence suggests a finding of only one proximate cause of harm as contemplated by the relevant state manslaughter statute).

error where the instructions given, on the whole, adequately cover the law). Accordingly, we hold that the PCR court correctly found that counsel was not ineffective on these grounds.

**c. Involuntary manslaughter as a lesser included offense**

 McKnight argues that counsel was ineffective in failing to request a jury charge on involuntary manslaughter as a lesser included offense of homicide by child abuse. We disagree.

 S.C.Code Ann. § 16–3–85 (2003) provides that a person is guilty of homicide by child abuse if the person "causes the death of a child under the age of eleven while committing child abuse or neglect . . . under circumstances manifesting an extreme indifference to human life." Involuntary manslaughter is defined as (1) the unintentional killing of another without malice, but while engaged in an unlawful activity not naturally tending to cause death or great bodily harm; or (2) the unintentional killing of another without malice, while engaged in a lawful activity with reckless disregard for the safety of others. *State v. Pittman*, 373 S.C. 527, 571, 647 S.E.2d 144, 167 (2007).

 The test for determining when an offense is a lesser included offense of another offense is whether the greater of the two offenses includes all the elements of the lesser offense. *State v. Northcutt*, 372 S.C. 207, 215, 641 S.E.2d 873, 877 (2007). If the lesser offense contains an element which is not included in the greater offense, it is not a lesser included offense of the greater offense. *Id.*

Under the elements test, the court of appeals determined in *State v. Mitchell*, 362 S.C. 289, 608 S.E.2d 140 (Ct.App.2005), that involuntary manslaughter is not a lesser included offense of homicide by child abuse. Although we disagree with the court of appeals' application of the elements test in *Mitchell*, and would accordingly vacate that portion of the opinion, we still find that under the elements test, involuntary manslaughter is not a lesser included offense of homicide by child abuse.

First, and as the court of appeals correctly reasoned, only the "unlawful activity" definition of involuntary manslaughter could potentially apply in the arena of child abuse because

child abuse is an unlawful act. · However, child abuse could never be defined as an unlawful activity "not tending to cause death or great bodily harm," and for this reason, the elements of involuntary manslaughter will never be included in the greater offense of homicide by child abuse.

Because involuntary manslaughter is not a lesser included offense of homicide by child abuse, we hold that the PCR court correctly determined that counsel was not ineffective for failing to request a jury charge on involuntary manslaughter.

### III. Equal protection

 McKnight argues that counsel was ineffective for failing to move to dismiss the charges on the grounds that the disparity between the sentences for criminal abortion and homicide by child abuse violates the Equal Protection Clause. We disagree.

The criminal abortion statute provisions relevant to this case provide that any woman who intentionally procures an illegal abortion will be guilty of a misdemeanor and upon conviction, may be imprisoned for no more than two years. S.C.Code Ann. § 44–41–80(b) (2002). The relevant HCA statute provisions state that a person who causes the death of a child under age eleven while committing child abuse or neglect under circumstances manifesting extreme indifference to human life may be imprisoned for life, and for no less than a term of twenty years. S.C.Code Ann. § 16–3–85(a)(1) & (c)(1).

The Equal Protection Clause provides that no State shall deny to any person within its jurisdiction the equal protection of the laws. U.S. Const. amend. XIV, § 1. A classification does not violate the Equal Protection Clause if (1) "similarly situated" members in a class are treated alike; (2) the classification rests on some reasonable basis; and (3) the classification bears a reasonable relation to a legitimate legislative purpose. *See Ed Robinson Laundry & Dry Cleaning, Inc. v. S.C. Dept. of Revenue,* 356 S.C. 120, 124, 588 S.E.2d 97, 99 (2003).

In our opinion, the PCR court correctly determined that McKnight has no equal protection claim in the first instance because she is not similarly situated to individuals prosecuted under the criminal abortion statute. *See id.* (rejecting an

equal protection claim for failure to show disparate treatment of similarly situated entities in the first instance). McKnight never argued that she intended to cause an abortion through her cocaine use, and therefore, her circumstances are different than those who possess the requisite intent to abort a fetus under the criminal abortion statute.

Next, even if this Court were to consider child abusers similarly situated to illegal abortion seekers, the determination of whether a classification is reasonable is initially one for the legislative body and will be sustained if it is not plainly arbitrary and there is a reasonable hypothesis to support it. *Curtis v. State*, 345 S.C. 557, 574, 549 S.E.2d 591, 600 (2001). Here, the abortion statute does not criminalize all abortions, but rather, only illegal abortions, i.e., those that do not conform to the criteria in the statute. *See* S.C.Code Ann. § 44–41–20 (2002). The HCA, on the other hand, criminalizes homicide as a result of any and all abuse of children between viability and age eleven. In our opinion, there is nothing arbitrary or unreasonable in establishing different sentences for offenders of distinct crimes. *See also Davis v. County of Greenville*, 313 S.C. 459, 465, 443 S.E.2d 383, 386 (1994) ("The fact that the classification may result in some inequity does not render it unconstitutional.").

Finally, a legislative history of the statutes is instructive in analyzing whether there is a legitimate legislative purpose for the different sentences. In 1974, the General Assembly amended the criminal abortion statute to its current form in accordance with the United States Supreme Court's decision in *Roe v. Wade*.[7] Our jurisprudence on the applicability of South Carolina criminal law to viable fetuses, on the other hand, did not substantively develop until the 1980's and 1990's,[8] and in 1992, nearly twenty years after *Roe v. Wade*, the General Assembly enacted the HCA statute. This time differential between the enactment of the two statutes, as well

---

7. 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

8. *See, e.g., State v. Horne*, 282 S.C. 444, 319 S.E.2d 703 (1984) (holding that a "person" under the South Carolina murder statute includes viable fetuses); *Whitner v. State*, 328 S.C. 1, 492 S.E.2d 777 (1997) (holding that a "child" under the South Carolina child abuse and endangerment statute includes viable fetuses).

as the placement of the HCA statute in the Crimes and Offenses section of the Code in contrast to the placement of the criminal abortion statute in the Health section of the Code, reflects the General Assembly's legitimate interest in the protection of unborn children, separate and distinct from its interest in the health of expectant mothers and their own unborn children.[9]

For these same reasons, we believe that any sentencing differences in the two statutes reflect a valid legislative determination for the need to target a specific societal problem. *See Gary Concrete Products, Inc. v. Riley,* 285 S.C. 498, 505, 331 S.E.2d 335, 339 (1985) ("[T]he judiciary may not sit as a super-legislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines." (quoting *City of New Orleans v. Dukes,* 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976))). Accordingly, we hold that the PCR court correctly determined that counsel was not ineffective in failing to argue that the HCA statute violated the Equal Protection Clause.

## IV. Autopsy report

McKnight argues that counsel was ineffective for failing to introduce the autopsy report into evidence. We agree.

After introducing the report at the first trial, counsel's only reason for neglecting to introduce the report at the second trial is that she "just forgot." The PCR court found that this error did not prejudice McKnight because the author of the autopsy report testified to its contents, and therefore, the report itself would have merely been cumulative evidence.

We find that the autopsy was a powerful piece of documentary evidence that was crucial to McKnight's defense because it contradicted the State's theory of the case. The State's own expert authored the autopsy report which listed three causes

---

9. Legislative interest in the protection of unborn children persists in the current 2007–2008 legislative session in a bill which seeks to amend the HCA statute to expressly include the ingestion of certain illegal drugs by a mother during her pregnancy in the statutory definition of "child abuse or neglect."

of death: chorioamnionitis, funisitis, and cocaine. After McKnight's own expert could not rule out cocaine as a cause of death, the autopsy report itself would have served as hard evidence to (1) undermine the conclusion of Dr. Woodard, the only expert who opined that cocaine alone caused the fetal demise, and (2) remind jurors of the inconsistencies in the State's experts' testimony.

For these reasons, we hold that counsel's failure to introduce the autopsy report into evidence was deficient, and that this deficiency, in the absence of otherwise helpful testimony from her own expert, was prejudicial to McKnight. Accordingly, the PCR court erred in determining counsel was not ineffective on these grounds.

## V. Intent

McKnight argues that counsel was ineffective in failing to argue that there was no evidence on the record suggesting that McKnight knew that using cocaine risked harming her fetus's life. We disagree.

In *Whitner v. State*, 328 S.C. 1, 492 S.E.2d 777, this Court held that a viable fetus was a "child" as used in the child abuse and endangerment statute, S.C.Code Ann. § 20–7–50 (1985), and therefore upheld a mother's conviction under the statute for her cocaine use during the third trimester of her pregnancy. We noted that "[a]lthough the precise effects of maternal crack use during pregnancy are somewhat unclear, it is well documented and within the realm of public knowledge that such use can cause serious harm to the viable unborn child." *Id.* at 10, 492 S.E.2d at 782. Therefore, this Court concluded that Whitner's drug use unquestionably violated the child endangerment statute. *Id.* at 11, 492 S.E.2d at 782.

Although the PCR court sanctioned counsel's performance in this regard based on the "highly deferential" review of counsel's strategic position in delivering closing arguments, we find the need to look no further than the prejudice prong of the *Strickland* test in order to resolve the matter. This Court correctly acknowledged in *Whitner* that men of common understanding are familiar with the harmful effects of cocaine. Therefore, a reasonable jury would certainly not be persuaded by the argument that McKnight did not know that her cocaine

use posed risks to her unborn child. Accordingly, even if counsel erred in failing to argue that McKnight did not know using cocaine posed risks to her unborn child, this deficient performance was not prejudicial. Therefore, we hold that the PCR court did not err in determining that counsel was not ineffective on these grounds.

## VI. Expert testimony at the PCR hearing

McKnight argues that the PCR court erred in excluding testimony on the professional standards of South Carolina defense lawyers. We disagree.

The decision to admit affidavits, depositions, oral testimony, or other evidence at a PCR hearing is within the PCR court's discretion and will not be reversed absent an abuse of discretion resulting in prejudice to a party. *See Simpson v. Moore*, 367 S.C. 587, 607–08, 627 S.E.2d 701, 712 (2006).

In the instant case, the PCR court rejected McKnight's proffer of expert testimony on the prevailing professional standards for South Carolina defense attorneys based on *Green v. State*, 351 S.C. 184, 569 S.E.2d 318 (2002). In *Green*, this Court reviewed a defendant's claim that the PCR court erred in excluding opinion testimony from a criminal defense attorney as to acceptable legal standards of defense practice. *Id.* at 198, 569 S.E.2d at 325. Acknowledging that expert testimony designed to assist the PCR court to understand certain facts was admissible, the Court found that the expert offered no factual evidence, but rather, assumed certain facts in arriving at his conclusion that trial counsel's performance was deficient. *Id.* Accordingly, the Court held that the PCR court properly excluded the testimony because it was merely a legal argument as to how the PCR court should rule on the issue. *Id.*

Turning to the instant case, we hold that the PCR court properly excluded the testimony of McKnight's expert. Although McKnight offered the expert to provide factual testimony on prevailing professional standards of South Carolina defense attorneys, PCR counsel's questions consistently inquired into how a lawyer practicing in accordance with the prevailing standards in South Carolina would handle certain factual scenarios derived directly from this case. As a result,

the expert's opinion, amounted to a case-specific application of the *Strickland* test that was not designed to assist the PCR court to understand certain facts, but rather, was a legal argument as to why the PCR court should rule that McKnight's trial counsel was ineffective. Accordingly, the PCR court did not abuse its discretion in excluding the expert testimony in the context that the testimony was offered.

## CONCLUSION

For the foregoing reasons, we reverse the PCR court's denial of relief.

MOORE, WALLER and BEATTY, JJ., concur.

PLEICONES, J., concurring only in result.