709 S.E.2d 671

**Lucas BAILEY, Petitioner,**

v.

**STATE of South Carolina, Respondent.**

No. 26975.

Supreme Court of South Carolina.

Submitted March 16, 2011.

Decided May 9, 2011.

Tara Shurling, of Columbia, for Petitioner.

Attorney General Alan Wilson, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Salley W. Elliott and Assistant Attorney General Mary S. Williams, of Columbia, for Respondent.

Justice BEATTY.

After his conviction for homicide by child abuse[1] was affirmed on direct appeal, Lucas Bailey filed an application for post-conviction relief (PCR). We granted a petition for a writ of certiorari to review the denial of PCR. Bailey contends the judge erred in denying PCR as trial counsel was ineffective in failing to object to supplemental jury instructions that allowed the jury to convict him for an act that was not alleged in the indictment. We reverse and remand for a new trial.

## I. Factual/Procedural Background

This case arises from the tragic death of sixteen-month-old Charles Devon Allen ("Victim"). At the time of his death, Victim lived with his mother, Amy Hughes, her boyfriend, Bailey, and Victim's two sisters, who were then five and six years old, respectively.[2]

Around 6:00 p.m. on Thursday, April 26, 2001, Bailey called 9–1–1 and reported that Victim was not breathing. When Aiken County emergency personnel arrived, they found Victim lying face down on the bed. The coroner pronounced Victim dead as his body was "cool to the touch" and *rigor mortis* had begun to set in. Based on the history presented by Bailey and Hughes, investigators initially believed that Victim might have died from an accidental overdose of cold medications. However, upon examining Victim's body, the coroner noticed three "circular marks" or "discolorations" on the child's abdomen.

The next day, Dr. Joel Sexton, a forensic pathologist, performed an autopsy. Dr. Sexton noted visible bruises on Victim's abdomen. Upon further examination, he discovered "extensive internal injuries in the abdominal region and in the head region." Injuries to the intestines and the mesentery arteries and veins indicated multiple blows had torn the areas by compression against the spine. As to Victim's head, Dr. Sexton noted that "there were numerous small round contu-

---

1. S.C.Code Ann. § 16–3–85 (2003).

2. Bailey was not the biological father of Victim or Hughes's other children; however, Hughes was pregnant with Bailey's child at the time of Victim's death.

sions . . . in the front, on the top of the head, on the right side of the head and in the back," which resulted in swelling of the brain. According to Dr. Sexton, the contusions were consistent with a fist or a knuckle-sized object hitting the head. He believed the head injuries contributed to Victim's death and were consistent with some of the symptoms exhibited by Victim prior to his death. He explained that a head injury leads to swelling of the brain, which in turn causes vomiting, lethargy, a "limp" body, and eyes that "roll back" into the head.

Ultimately, Dr. Sexton opined the abdominal injuries were the primary cause of Victim's death. He believed that at least one of the abdominal injuries had occurred hours before death. He concluded that the later abdominal injuries could have caused Victim's death within minutes due to the loss of blood. The cause of death was "listed as blood loss which we refer to as exsanguination due to laceration of these mesentery arteries and veins . . . due to blunt force injury to the abdomen due to a beating." Although Dr. Sexton could not definitively pinpoint Victim's time of death, he opined that it occurred sometime after 2:30 p.m. on Thursday, April 26, 2001. Dr. Sexton believed Victim's injuries were inflicted by an adult as a child would not have had the "force" to cause these injuries. Finally, he did not believe the cold medications given to Victim prior to his death caused or contributed to the death.

Law enforcement interviewed Hughes and Bailey. Subsequently, an Aiken County grand jury indicted Bailey for homicide by child abuse.

At trial, Hughes testified for the State. Hughes testified that she had worked on the Monday and Tuesday preceding Victim's death. According to Hughes, Victim was cared for by Bailey on Monday and then went to daycare on Tuesday. Because Victim had a cold on Wednesday, Hughes stayed home from her job to care for him. Hughes recalled that she and Victim went to sleep in the same bed around 8:00 p.m. Around 12:00 or 12:30 a.m., Bailey took Victim into the kitchen to feed him. Hughes, who had remained in bed, heard a "loud noise" coming from the kitchen followed by Victim crying out. Although Hughes did not get up to check on Victim, she asked Bailey what had happened, to which Bailey responded, "Noth-

ing." When Bailey returned to bed around 12:50 a.m., he told Hughes that he had put Victim in the bed with his sisters.

Hughes stated that her oldest daughter came in the next morning and reported that Victim had thrown up. According to Hughes, Bailey got up and when he returned he told Hughes that Victim was fine and that he had cleaned him up and placed him in his crib. When Hughes checked on Victim later on Thursday morning, she observed that Victim was unusually quiet and did not stand up in his crib. After taking her daughter to school, Hughes returned and gave Victim some medicine for his cold, but Victim was unable to keep it down. Hughes stayed home from work to care for Victim and called a friend to bring additional cold medication. Hughes stated that Victim was unable to keep this medication down and that he was weak and "wasn't moving." She then took Victim into the bedroom where she laid down with him and Bailey. When Hughes's mother arrived around noon, Hughes left Victim with Bailey. While she was talking with her mother, Hughes heard a "loud sound" from her bedroom. Hughes then asked her daughter to get Victim, but her daughter reported that Bailey told her "no."

Approximately twenty or thirty minutes later, Hughes's daughter took Victim out of the bedroom and brought him to Hughes. Hughes described Victim as "droopy," unable to sit up on his own, and that his eyes rolled back into his head. Around 2:00 p.m., Hughes's friend returned with a different cold medication that Victim was able to tolerate. Hughes testified that Victim fell asleep and Bailey then put him to bed. After she laid down with Victim for approximately thirty minutes to an hour, she got up and checked that Victim was breathing normally.

Around 5:00 p.m., Hughes left the home to drive Bailey's mother to the store. When Hughes returned home around 6:00 or 6:30 p.m., she found emergency personnel at her home. At that time, she was informed that Victim was dead. Hughes ultimately claimed that Bailey had struck Victim, resulting in his death.

During his testimony, Bailey adamantly denied hitting Victim or causing his death. Although Bailey recounted essentially the same timeline as Hughes, he claimed that he and

Hughes discussed taking Victim for medical treatment but decided to see if Victim felt better after taking medication on Thursday. He further testified that he checked on Victim after Hughes left on Thursday afternoon and discovered that Victim was not breathing.

In his jury charge, the judge instructed the jurors on the offense of homicide by child abuse by reading the applicable statutory language.[3]

Approximately one hour into deliberations, the jury sent a note to the judge with several questions concerning evidentiary issues. Additionally, the jury asked "the difference between the indictment and the last statement on the indictment form"[4] and "whether the neglect has to directly contribute to the death." In response to the notes, counsel believed that

---

3. Specifically, the judge read the following provisions of section 16–3–85:

(A) A person is guilty of homicide by child abuse if the person:
(1) causes the death of a child under the age of eleven while committing child abuse or neglect, and the death occurs under circumstances manifesting an extreme indifference to human life;
. . . .
(B) For purposes of this section, the following definitions apply:
(1) "child abuse or neglect" means an act or omission by any person which causes harm to the child's physical health or welfare;
(2) "harm" to a child's health or welfare occurs when a person:
(a) inflicts or allows to be inflicted upon the child physical injury, including injuries sustained as a result of excessive corporal punishment;
(b) fails to supply the child with adequate food, clothing, shelter, or health care, and the failure to do so causes a physical injury or condition resulting in death; or
(c) abandons the child resulting in the child's death.
S.C.Code Ann. § 16–3–85(A)(1), (B) (2003).

4. The text of the indictment provided:

That LUCAS LORENZO BAILEY did in Aiken County on or about April 26, 2001, commit the crime of Homicide By Child Abuse in violation of South Carolina Code Ann. Section 16–3–85, in that the defendant did cause the death of Charles D. Allen, a child two (2) years of age, while committing child abuse or neglect as defined by South Carolina Code Section 20–7–490, and the death of said child occurred under circumstances manifesting an extreme indifference to human life, in that Lucas Lorenzo Bailey was responsible for the welfare of said child and the defendant did inflict physical harm to the child, to wit: **The defendant inflicted upon said child physical injuries to his abdomen resulting in exsanguination and consequently the death of the child.**

recharging the statute on the offense of homicide by child abuse would be appropriate.

When the jury returned to the courtroom, the foreman referenced the last sentence of the indictment and explained that the jury "wanted to get an understanding of the meaning of the indictment." After the judge read the last sentence of the indictment, the foreman responded:

Well, the definition was the question we [were] asking for. Also, our verdict to ... to say this person did that last statement ... you're talking two different ...

Before the foreman finished his statement, the judge explained the purpose of the indictment was to "state the charges with enough specificity so that the defendant knows what he has to defend against." The judge then re-read the applicable provisions of the homicide by child abuse statute and gave the jury a printed copy of the statute.

Approximately thirty minutes later, the jury sent out another note, stating:

Does the State have to prove beyond a reasonable doubt: *that the defendant caused the death of the child* and does the neglect or abuse have to have caused the death?

Counsel and the judge debated the meaning of the jury's question. When the jury returned to the courtroom, the judge explained that "in this case, the only allegations are that [the defendant] caused the death of the child by neglect and abuse," and that under the statute several acts qualified as "neglect and abuse," but the State was required to prove only one of them.

In response, the foreman stated:

We see ... as a jury, total jury, we see the neglect in the parents, but we fail to see evidence that Lorenzo struck the child. There was no evidence to us that Lorenzo struck this child. There was neglect, yes, on both parties, but we fail to see that—and that's written in that document that we didn't see any evidence. We didn't see any evidence ... And the definition of your homicide has a combination of both. I know [its] a part of that definition, but we fail to see any evidence that he did that.

The judge then instructed the jury to refer to the language of the homicide by child abuse statute.

Out of the presence of the jury, defense counsel indicated her concern over the "emphasis on the neglect to the possible exclusion of the rest of the statute;" however, she believed the jury understood the judge's explanation.

When the jury returned to the courtroom, the judge issued supplemental instructions that stated in part:

[I]f you are distinguishing some acts that you would call abuse and some that you would call neglect, that's up to you as long as you kind of go by the statute here. The statute doesn't really ... It says it can be abuse or neglect, and it doesn't say which acts might be which, but it says that abuse or neglect is an act or omission which causes harm.

So if there is an act or omission which causes harm then that is abuse or neglect, by definition under this statute. Any act which causes, any act or omission, or failure to act, which causes harm to the child's health, that would be by this statute abuse or neglect, without getting into the difference of which is which, it doesn't matter.

The judge further explained that:

So you have to find that [the defendant] either did something or failed to do something ... that caused the death of the child. Either his doing something which is an act, or failing to do something which is an omission. And that that conduct on his part, either the act or the omission, caused the death of this child.

Moments later, a juror approached the bench and, in an off-the-record discussion, expressed her concern to the judge over the definition of the word "caused."[5] The judge then gave an instruction on proximate cause. In part, the judge stated:

---

**5.** We take this opportunity to caution the bench against engaging in off-the-record discussions with members of the jury. Here, the record does not reveal whether the attorneys were present during the exchange that culminated in the jury charge regarding proximate cause. Thus, we are troubled that the decision regarding the jury instruction may have been made without the judge conferring with the attorneys. Because this was not an issue raised for our consideration on appeal, we do not address any arguments challenging the procedure employed by the judge. However, we emphasize that we do not condone a judge's off-the-record discussion with a juror.

"You must find that the State has convinced you beyond a reasonable doubt that either an act or failure to act on the part of this defendant is a proximate cause of the death of this child."

Nine minutes later, the jury returned with a guilty verdict. The judge denied counsel's motion for a new trial and sentenced Bailey to twenty-five years' imprisonment.

Bailey appealed his conviction and sentence to the Court of Appeals, alleging the trial judge erred in declining to direct a verdict of acquittal. The court affirmed Bailey's conviction and sentence, concluding that "substantial circumstantial evidence" supported a finding that Bailey abused Victim. *State v. Bailey,* Op. No.2003–UP–744 (S.C.Ct.App. filed Dec. 17, 2003).

Subsequently, Bailey filed a timely PCR application. After a hearing, the PCR judge denied Bailey's application. As to trial counsel's performance, the PCR judge found, in part, that counsel was not ineffective for failing to object to certain jury instructions. In so ruling, the PCR judge concluded that counsel's decision constituted trial strategy and that even if counsel's performance was deficient, Bailey had not proven prejudice.

## II. Discussion

### A.

Bailey contends the judge erred in denying his PCR application as his trial counsel was ineffective in failing to object to the trial judge's supplemental jury instructions. In support of this contention, Bailey claims the instructions allowed the jury to convict him for "an act alternative to the one specified with particularity in the indictment." Because "the infliction of physical injuries was the specific act alleged in the indictment," Bailey asserts the jury was limited to a determination of whether he committed this act. Based on the foreman's statement that the jury found no evidence that Bailey struck the child, Bailey claims the jury found "a material variance between the act alleged in the indictment and the State's proof." Specifically, Bailey avers the jury convicted him of an unindicted crime as the jury found evidence of neglect rather than the specifically-alleged acts of abuse. Given that the

judge's erroneous instructions precipitated this result, Bailey asserts his trial counsel was ineffective in failing to object to these supplemental instructions.

### B.

The Sixth Amendment to the United States Constitution guarantees a defendant the right to effective assistance of counsel. U.S. Const. amend. VI; *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Lomax v. State,* 379 S.C. 93, 665 S.E.2d 164 (2008).

The United States Supreme Court has established a two-pronged test to establish ineffective assistance of counsel by which a PCR applicant must show (1) counsel's performance was deficient, and (2) the deficient performance prejudiced the defendant. *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052; *Cherry v. State,* 300 S.C. 115, 386 S.E.2d 624 (1989). Under the second prong, the PCR applicant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial." *Simmons v. State,* 331 S.C. 333, 338, 503 S.E.2d 164, 166 (1998).

This Court will uphold the findings of the PCR judge when there is any evidence of probative value to support them, and will reverse the decision of the PCR judge when it is controlled by an error of law. *Suber v. State,* 371 S.C. 554, 558–59, 640 S.E.2d 884, 886 (2007).

### C.

As a threshold matter, the State claims Bailey's issue is not preserved for appellate review given it was not raised to and ruled upon by the PCR judge. We disagree.

In his PCR application, Bailey characterized the trial judge's instructions as erroneous and confusing because the jury was misled regarding the homicide by child abuse statute and the indictment. Additionally, Bailey argued that trial counsel was ineffective in failing to object to certain instructions.

During the PCR hearing, Bailey testified that his trial counsel failed to object to the improper jury instructions. In explaining this claim, Bailey referenced the trial judge's supplemental instructions and the judge's discussions with the jury regarding its questions. Trial counsel admitted that she did not object to these instructions and contended her decision constituted trial strategy. Finally, in his written order, the PCR judge addressed Bailey's allegation of "ineffective assistance of counsel for failing to object to jury charges."

Based on the foregoing, we find Bailey's argument was properly preserved for this Court's review. *See State v. Moore*, 357 S.C. 458, 593 S.E.2d 608 (2004) (holding an issue must be raised to and ruled upon by the trial court to be preserved for appellate review).

### D.

Having found that Bailey's issue is properly before this Court, we turn to the merits.

 "In South Carolina, '[i]t is a rule of universal observance in administering the criminal law that a defendant must be convicted, if convicted at all, of the particular offense charged in the bill of indictment.'" *State v. Gunn*, 313 S.C. 124, 136, 437 S.E.2d 75, 82 (1993) (quoting *State v. Cody*, 180 S.C. 417, 423, 186 S.E. 165, 167 (1936)). "A material variance between charge and proof entitles the defendant to a directed verdict; such a variance is not material if it is not an element of the offense." *Id.* (citation omitted); *see* 41 Am.Jur.2d *Indictments & Informations* § 252 (2005) (stating that one of the two ways an indictment can be improperly modified is through "a variance, whereby the charging terms of the indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment").

 "[W]hile a conviction may be sustained under an indictment which is defective because it omits essential elements of the offense, such is not true when the indictment facially charges a complete offense and the State presents evidence which convicts under a different theory than that alleged." *Thomason v. State*, 892 S.W.2d 8, 11 (Tex.Crim.

App.1994) (citations omitted). "A conviction under the latter circumstance violates principles of due process ... because the State has failed to prove beyond a reasonable doubt every fact necessary to constitute the crime with which a defendant was charged." *Id.* (citations omitted); *see* 41 Am.Jur.2d *Indictments & Informations* § 256 (2005) ("A material variance that violates a defendant's substantial right to be tried only on charges presented in an indictment constitutes fatal error and warrants a reversal on an appeal of a judgment of conviction of the offense not charged in the indictment.").

In a case involving similar facts to the instant case, the Texas Court of Appeals found error in the trial judge's jury instructions that permitted the jury to convict the defendant of an act not alleged in the indictment. *Castillo v. State,* 7 S.W.3d 253 (Tex.Ct.App.1999). In *Castillo,* the defendant was charged with the felony offense of intentionally and knowingly causing serious bodily injury to a child and convicted of the lesser-included offense of reckless injury to a child pursuant to section 22.04(a)(1) of the Texas Penal Code. *Id.;* Tex. Penal Code Ann. § 22.04(a)(1) (1994) ("A person commits an offense if he intentionally, knowingly, recklessly, or with criminal negligence, by act or intentionally, knowingly, or recklessly by omission, causes a child ... serious bodily injury."). The one-count indictment charging Castillo with this offense provided that Castillo:

> [d]id then and there intentionally and knowingly cause serious bodily injury to Triston Castillo, a child 14 years or younger by then and there striking the child with a deadly weapon, to wit: the defendant's hands or by striking the child's head against a deadly weapon, to wit: a wall or a floor.

*Id.* at 255. In prefacing its analysis, the Texas Court of Appeals noted that "[b]y including a more specific description, the State undertook the burden of proving the specific allegations to obtain a conviction." *Id.*

At trial, the child's mother testified that the morning the child was taken to the hospital, she was taking a shower when she heard the child "crying out loudly" while in Castillo's care. When she went to check on the child, she observed that he was "in a daze," "seizing," and "limp." *Id.* at 255. Although

Castillo admitted to shaking the child because he was having difficulty breathing, he expressly denied that the child hit or struck a wall. *Id.* at 257.

On appeal, Castillo raised several issues, including an argument that the trial judge egregiously erred by adding, through a lesser-included offense charge, a theory of prosecution ("shaking") that was not supported by the indictment. *Id.* at 254. The Texas Court of Appeals agreed with Castillo's argument, finding the trial court erred in "enlarging" the indictment by adding "shaking" as an additional manner and means of committing the charged offense. *Id.* at 260. In so ruling, the court recognized that a defendant may only be tried and convicted of the crimes alleged in the indictment and the State is bound by the theory alleged in the indictment. *Id.* at 258–59.[6]

In light of its holding, the court declined to reach Castillo's claim of ineffective assistance of counsel. The court, however, noted the claim would "loom large on the scene, given the failure to move for an instructed verdict and to object to the charge which enlarged the indictment." *Id.* at 262.

We agree with the reasoning in *Castillo* and apply its analysis to the facts of the instant case. We conclude that the trial judge's instructions improperly "enlarged" the indictment by instructing the jury that it could convict Bailey of a crime not alleged in the indictment.

Here, the indictment charging Bailey with homicide by child abuse specifically alleged that Bailey "inflicted upon [Victim] physical injuries to his abdomen resulting in exsanguination and consequently the death of the child." By its express terms, the indictment alleged that Bailey's "act" resulted in Victim's death. Significantly, it did not allege that Victim's death was the result of an "omission" on the part of Bailey.

Thus, the indictment apprised Bailey that he had to defend only against the allegation that he inflicted the physical inju-

---

6. Notably, the court stated in its conclusion that its decision did not prevent "the State from seeking a new indictment charging injury to a child and alleging a different manner and means of committing the offense such as 'shaking,' and trying appellant on the new indictment." *Id.* at 262.

ries resulting in Victim's death. *See Evans v. State*, 363 S.C. 495, 508, 611 S.E.2d 510, 517 (2005) ("The primary purposes of an indictment are to put the defendant on notice of what he is called upon to answer, *i.e.*, to apprise him of the elements of the offense and to allow him to decide whether to plead guilty or stand trial, and to enable the circuit court to know what judgment to pronounce if the defendant is convicted."); *State v. Gentry*, 363 S.C. 93, 102, 610 S.E.2d 494, 500 (2005) ("The indictment is a notice document.").

A careful review of the jury's questions and the ensuing discussion with the judge reveals that the jury focused on the terms of the indictment and recognized the alternative elements in the homicide by child abuse statute, *i.e.*, an "act" versus an "omission." The foreman of the jury then stated the jury found "no evidence" that Bailey struck the Victim.[7] Based on this statement and the reference to the last line of the indictment, it is evident the jury was inquiring as to whether a finding of "neglect" on the part of Bailey was sufficient for a conviction under the statute.

The judge's supplemental instructions, which were confusing and contradictory, resulted in the erroneous directive that the jury could find Bailey guilty of homicide by child abuse if it found an act of "abuse *or* neglect." Such an instruction was in direct contravention of the specific act alleged in the indictment and, thus, constituted a material variance or a "constructive amendment" to the indictment.

 We find that trial counsel not only failed to object to these jury instructions, but also acquiesced in the judge's erroneous interpretation. Thus, counsel's failure to object did not constitute a valid trial strategy. *Cf. Padgett v. State*, 324 S.C. 22, 484 S.E.2d 101 (1997) (finding trial counsel's failure to challenge first-degree burglary indictment did not constitute valid trial strategy where counsel did not recognize the dis-

---

7. By his statement, the foreman was conveying the jury's deliberations as to whether there was "direct evidence" that Bailey struck Victim. Thus, we believe it would have been prudent and more appropriate for the trial judge to instruct the jury on "circumstantial evidence" in order to resolve the jury's confusion.

tinction between a "barn" and a "dwelling" for the purposes of first-degree burglary).

■■■ Having found that trial counsel's performance was deficient, the question becomes whether Bailey was prejudiced by counsel's errors.[8] Because the supplemental instructions created a material variance between the State's evidence and the allegations in the indictment, we conclude that Bailey was prejudiced by trial counsel's failure to object as this deficiency undermined confidence in the outcome of his trial. Accordingly, we hold trial counsel rendered ineffective assistance. *See McKnight v. State*, 378 S.C. 33, 48–49, 661 S.E.2d 354, 361–62 (2008) (finding trial counsel rendered ineffective assistance when she failed to object to the supplemental jury charge on the measure of criminal intent required for a conviction under the Homicide by Child Abuse statute; reasoning that the supplemental charge: (1) did not clarify the particular mental state and served to "further confuse the jury;" (2) "attained a special significance in the minds of the jurors;" and (3) was "prejudicial in fact" as the jury returned a guilty verdict five minutes after the supplemental charge).

### III. Conclusion

In conclusion, we find Bailey's issue was preserved for appellate review as it was raised to and ruled upon by the PCR judge. In terms of the merits, we hold trial counsel was deficient in failing to object to the supplemental jury instructions as the judge perpetuated the jury's confusion that they could convict Bailey of homicide by child abuse based on an unindicted allegation of neglect. We find that a confluence of the lone specific allegation of physical abuse in the indictment and the jury's expressed confusion about the necessity of evidence of physical abuse by Bailey with the insufficient jury instructions created a structural due process defect that deprived Bailey of a fair trial. We conclude that Bailey was prejudiced by counsel's deficient performance. Accordingly,

---

8. We reject any contention that the Court of Appeals' opinion affirming Bailey's conviction negates a finding of prejudice as the court only considered the evidence in the context of a directed verdict motion. Although we agree there was sufficient evidence to submit the case to the jury, the issue in this case requires a consideration of the evidence *after* the submission of the case to the jury.

we reverse the order of the PCR judge and remand for a new trial.

**REVERSED AND REMANDED.**

TOAL, C.J., PLEICONES, KITTREDGE and HEARN, JJ., concur.